NO. 23-1568

# United States Court of Appeals

*for the*

# Fourth Circuit

———————————————

CARMEN WANNAMAKER-AMOS,

*Plaintiff-Appellant,*

– v. –

PUREM NOVI, INC., f/k/a Eberspaecher North America, Inc.,
d/b/a Eberspaecher Group and Purem by Eberspaecher,

*Defendant-Appellee.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA AT GREENVILLE IN CASE
NO. 6:21-CV-02359-KFM, HONORABLE KEVIN F. MCDONALD

## OPENING BRIEF OF APPELLANT

BRIAN P. MURPHY
STEPHENSON & MURPHY, LLC
207 Whitsett Street
Greenville, South Carolina 29601
(864) 370-9400

*Attorneys for Plaintiff-Appellant*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 23-2568    Caption: Carmen Wannamaker-Amos v. Purem Novi, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Carmen Wannamaker-Amos
(name of party/amicus)


who is _____Plaintiff-Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.   Does party/amicus have any parent corporations?   ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:


3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?                    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                ☐ YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐ YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Brian P. Murphy _____        Date: _____ June 1, 2023 _____

Counsel for: Plaintiff-Appellant _____

Print to PDF for Filing

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iv

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ....................................................................1

STATEMENT OF THE CASE.................................................................2

    A.    Nature of the Case .................................................................2

    B.    Factual Background................................................................3

        1.    The parties .................................................................3

        2.    Wannamaker-Amos's duties ......................................4

        3.    Purem Novi and others heralded Wannamaker-Amos's performance ...........................................5

        4.    Hosseini long wanted to terminate Wannamaker-Amos's employment ..............................5

        5.    Hosseini also does not like women............................6

        6.    Purem Novi moves the Hyundai program from Alabama to Spartanburg .............................7

        7.    Wannamaker-Amos performed far better than peers at the Spartanburg facility...........................9

        8.    The WCC missing pipe ..............................................9

        9.    Hosseini terminates Wannamaker-Amos based on false statements................................................12

            a.    The significant damages lie ............................13

            b.    Purem Novi did not approve safe launch containment................................................14

            c.    First piece inspection was in place .................16

            d.    WCC PFMEA not reviewed or updated.........................17

            e.    Control plan not updated ................................19

i

          f.     Critical characteristics monitoring form.........................20

          g.     Red box management not in place...................................20

          h.     Process audit not reflecting reality ................................21

          i.     Wannamaker-Amos did not respond to Hyundai on time ......................................................................................22

     10.    Purem Novi violated its own policies that call for performance improvement efforts and prior warnings before termination .......................................................................23

     11.    Complaints from Hyundai increased after Wannamaker-Amos's termination ..............................................25

     12.    Purem Novi tried to justify Hosseini's decision with more false assertions ...................................................................25

          a.     Purem Novi falsely claimed that Hosseini made his decision based on production records.....................25

          b.     Purem Novi falsely claimed that Wannamaker-Amos caused it to produce and ship bad parts ..............26

SUMMARY OF ARGUMENT ....................................................................27

STANDARD OF REVIEW .........................................................................28

ARGUMENT .................................................................................................28

   A.    The District Court's pretext rulings conflict with its prima facie rulings ............................................................................28

   B.    The District Court erred in trying to limit this Court's decision in *Cowgill v. First Data Technologies* ...................................31

   C.    The District Court erred in finding that Wannamaker-Amos failed to respond to Hyundai .................................................35

     1.    The District Court erred in relying on Wannamaker-Amos's regular duties ..............................................................36

     2.    Purem Novi knows that Wannamaker-Amos did all she could have done at the time ......................................................36

3.    The District Court erred in claiming that documentation existed of Wannamaker-Amos's failure to respond ................................................................37

4.    The Hyundai issues had nothing to do with Hosseini's desire to fire Wannamaker-Amos ............................................38

D.    The District Court improperly allowed Purem Novi to ignore debunked reasons .......................................................................39

1.    Hosseini's original reasons in the Supporting Evidences Doc ...........................................................................40

2.    Purem Novi's production log assertion ...................................42

3.    Purem Novi's claim that Wannamaker-Amos caused it to ship bad parts ....................................................................42

E.    The District Court improperly limited pretext evidence and weighed evidence ...................................................................44

1.    Race .................................................................................44

2.    Sex ...................................................................................47

F.    The District Court erred in claiming that Wannamaker-Amos failed to provide comparator evidence ...............................................48

CONCLUSION ...................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alvarado v. Board of Trustees of Montgomery Cmty. Coll.*,
  928 F.2d 118 ..........................................................................................32

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................... 44, 45

*Anderson v. Ziehm Imaging, GmbH*,
  No. 7:09-cv-02574-JMC, 2011 U.S. Dist. LEXIS 39874
  (D.S.C. Apr. 12, 2011).......................................................................46

*Ballinger v. N.C. Agric. Extension Serv.*,
  815 F.2d 1001 (4th Cir. 1987) ........................................... 41, 42

*Baqir v. Principi*,
  434 F.3d 733 (4th Cir. 2006) .......................................................45

*Bassett v. City of Minneapolis*,
  211 F.3d 1097 (8th Cir. 2000) ....................................................33

*Boyer-Liberto v. Fontainebleau Corp.*,
  786 F.3d 264 (4th Cir. 2015) ......................................................48

*Brinkley v. Harbour Rec. Club*,
  180 F.3d 598 (4th Cir. 1999) ......................................................46

*Bullock v. Kendall*,
  No. 21-2111, 2022 U.S. App. LEXIS 19981 (4th Cir. July 20, 2022).... 38-39

*Burns v. AAF-McQuay, Inc.*,
  96 F.3d 728 (4th Cir. 1996) ........................................................41

*Burton v. Freescale Semiconductor, Inc.*,
  798 F.3d 222 (5th Cir. 2015) ......................................................32

*Charbonnages de France v. Smith*,
  597 F.2d 406 (4th Cir. 1979) ......................................................41

*Cowgill v. First Data Techs., Inc.*,
  41 F.4th 370 (4th Cir. 2022) ............................................... *passim*

*DeMasters v. Carilion Clinic*,
  796 F.3d 409 (4th Cir. 2015) ......................................................48

iv

*Dennis v. Columbia Colleton Med. Ctr., Inc.*,
    290 F.3d 639 (4th Cir. 2002) .......................................................41

*E.E.O.C. v. Warfield-Rohr Casket Co., Inc.*,
    364 F.3d 160 (4th Cir. 2004) .......................................................45

*Edwards v. BCDR, LLC*,
    Civ. A. No. 3:19-cv-02671-JMC, 2022 U.S. Dist. LEXIS 59900
    (D.S.C. Mar. 31, 2022) ...............................................................48

*EEOC v. Fairbrook Med. Clinic, P.A.*,
    609 F.3d 320 (4th Cir. 2010) .......................................................45

*EEOC v. McLeod Health, Inc.*,
    914 F.3d 876 (4th Cir. 2019) .......................................................41

*EEOC v. Navy Fed. Credit Union*,
    424 F.3d 397 (4th Cir. 2005) .......................................................32

*Few v. Yellow Freight Sys.*,
    845 F.2d 123 (6th Cir. 1988) .......................................................33

*Francis v. Booz, Allen & Hamilton, Inc.*,
    452 F.3d 299 (4th Cir. 2006) .......................................................38

*Gary v. Facebook, Inc.*,
    822 F. App'x 175 (4th Cir. 2020).................................................41

*Guessous v. Fairview Prop. Invs., LLC*,
    828 F.3d 208 (4th Cir. 2016) .............................................. *passim*

*Hamilton v. 1st Source Bank*,
    895 F.2d 159 (4th Cir. 1990) .......................................................32

*Harris v. Richards Mfg. Co.*,
    511 F. Supp. 1193 (W.D. Tenn. 1981), *aff'd in part and rev'd in
    part on other grounds*, 675 F.2d 811 (6th Cir. 1982)...................33

*Hawkins v. PepsiCo, Inc.*,
    203 F.3d 274 (4th Cir. 2000) .......................................................45

*Hernandez v. Fairfax Cty.*,
    719 F. App'x 184 (4th Cir. 2018).................................................32

*Herold v. Hajoca Corp.*,
    864 F.2d 317 (4th Cir. 1988) .......................................................32

*Holland v. Washington Homes, Inc.*,
　487 F.3d 208 (4th Cir. 2007) ..........................................................41

*Jacobs v. N.C. Admin. Off. of the Courts*,
　780 F.3d 562 (4th Cir. 2015) .................................................. 38, 41

*Lettieri v. Equant Inc.*,
　478 F.3d 640 (4th Cir. 2007) .................................................. 30, 46

*Loveless v. John's Ford, Inc.*,
　232 Fed. Appx. 229 (4th Cir. 2007) ............................................45

*McDonald v. Santa Fe Trail Transp. Co.*,
　427 U.S. 273 (1976)......................................................................34

*McDonnell Douglas Corp. v. Green*,
　411 U.S. 792 (1973)................................................ 27, 28, 29, 34

*McGregory v. Crest/Hughes Techs.*,
　149 F. Supp. 2d 1079 (S.D. Iowa 2001) ......................................33

*Merritt v. Old Dominion Freight Line, Inc.*,
　601 F.3d 289 (4th Cir. 2010) .......................................................46

*Miles v. Dell, Inc.*,
　429 F.3d 480 (4th Cir. 2005) .......................................................28

*Mooberry v. Charleston S. Univ.*,
　Civ. Action No. 2:20-cv-00769, 2022 U.S. Dist. LEXIS 6803
　(D.S.C. Jan. 13, 2022)..................................................................32

*Nichols v. Ashland Hosp. Corp.*,
　251 F.3d 496 (4th Cir. 2001) .................................................. 32, 38

*Okoli v. City of Baltimore*,
　648 F.3d 216 (4th Cir. 2011) .................................................. 31, 35

*Ray v. Int'l Paper Co.*,
　909 F.3d 661 (4th Cir. 2018) .......................................................42

*Reeves v. Sanderson Plumbing Products, Inc.*,
　530 U.S. 133 (2000)................................................ 30, 34-35, 42

*Roberts v. Glenn Indus. Grp., Inc.*,
　998 F.3d 111 (4th Cir. 2021) .......................................................28

*Rowe v. Marley Co.*,
    233 F.3d 825 (4th Cir. 2000) .........................................................42

*Rowland v. Am. Gen. Fin., Inc.*,
    340 F.3d 187 (4th Cir. 2003) .................................................. 46-47

*Sempowich v. Tactile Sys. Tech., Inc.*,
    19 F.4th 643 (4th Cir. 2021) .................................................. 42, 45

*Smith v. CSRA*,
    12 F.4th 396 (4th Cir. 2021) .........................................................38

*Stiles v. General Elec. Co.*,
    No. 92-1886, 1993 U.S. App. LEXIS 2870 (4th Cir. Feb. 12, 1993) ..........32

*Texas Dept. of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981).........................................................................30

*United States Postal Serv. Bd. of Governors v. Aikens*,
    460 U.S. 711 (1983).................................................................. 41-42

*Vaughn v. Metrahealth Cos.*,
    145 F.3d 197 (4th Cir. 1998) .........................................................31

*Walker v. MCI Telecommunications Corp.*,
    1999 WL 503534 (4th Cir. 1999) .................................................41

*Walker v. Mod-U-Kraf Homes, LLC*,
    775 F.3d 202 (4th Cir. 2014) .........................................................35

*Westmoreland v. TWC Admin. LLC*,
    924 F.3d 718 (4th Cir. 2019) .................................... 31, 35, 45, 49

*Worldwide Network Servs., LLC v. DynCorp Int'l, LLC*,
    365 Fed. Appx. 432 (4th Cir. 2010) .............................................47

*Young v. UPS*,
    575 U.S. 206 (2015).........................................................................34

**Statutes & Other Authorities:**

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. § 1331 ..............................................................................1

28 U.S.C. § 1441(a) .........................................................................1

29 U.S.C. § 626(b) ..................................................................1

42 U.S.C. § 2000e-5(f)(3) ......................................................1

10A Charles Alan Wright & Arthur R. Miller *et al.*, Federal Practice &
    Procedures § 2728 (3d ed. 1998) ...................................41

Fed. R. App. P. 30(a)(2)........................................................24

Fed. R. App. P. 56.............................................................. 2, 44

Local Rule 34(a)...................................................................49

## JURISDICTIONAL STATEMENT

Appellant Carmen Wannamaker-Amos ("Wannamaker-Amos") commenced this action in the United States District Court for the District of South Carolina. JA7 (DE 1). The District Court exercised jurisdiction under 28 U.S.C. § 1441(a) as federal courts have original jurisdiction over Wannamaker-Amos's claims under Title VII, Section 1981, and the Age Discrimination in Employment Act ("ADEA"). 28 U.S.C. § 1331; 42 U.S.C. § 2000e-5(f)(3); 29 U.S.C. § 626(b).

On May 3, 2023, the District Court granted Appellee's ("Purem Novi") Motion for Summary Judgment and entered judgment. JA2 (DE 71, DE 72). Wannamaker-Amos filed her notice of appeal on May 24, 2023. *Id.* (DE 73). This Court has jurisdiction over the final order issued in the district court under 28 U.S.C. § 1291. Counsel for Appellant certifies that this appeal arises from a final order.

## STATEMENT OF ISSUES

I.   Whether the District Court erred in granting summary judgment on Wannamaker-Amos's sex and race discrimination claims when the District Court's findings are conflicting.

II.  Whether the District Court erred by distinguishing this Court's authority when it cited the wrong part of one decision, and it failed to acknowledge the many other cases from this Court illustrating the pretext principles that defeat Purem Novi's arguments.

1

III.    Whether the District Court erred in finding that Wannamaker-Amos failed to respond to Hyundai.

IV.    Whether the District Court erred in allowing Purem Novi to escape consequences for the false reasons that Purem Novi gave both at the time of termination and afterward.

V.    Whether the District Court erred by dismissing and weighing evidence contrary to the mandates of Rule 56.

## STATEMENT OF THE CASE

### A.    Nature of the Case

Wannamaker-Amos had the best quality record at the Spartanburg facility. Consequently, Purem Novi never warned Wannamaker-Amos or put her on a performance improvement plan. To the contrary, Wannamaker-Amos's direct managers and others at corporate lauded her performance.

For a long time, however, Javad Hosseini sought to terminate Wannamaker-Amos's employment. Hosseini believes black employees or, as he calls them, "colored people," are "lazy." Hosseini also had a disdain for women. Wannamaker-Amos, a black woman, never stood a chance.

Once Wannamaker-Amos's managers left the company, Hosseini had free rein to act on his racist and sexist beliefs. He used that opportunity to fire

2

Wannamaker-Amos for reasons he knew were false. Before the EEOC, Purem Novi added false reasons.

The District Court granted summary judgment based on inherently contradictory findings. The District Court did not accurately credit the evidence under Rule 56. The District Court also overlooked Purem Novi's debunked reasons and misapplied this Court's precedent. Disputed issues of material fact abound, and this Court should vacate the District Court's Order as to the race and sex discrimination claims, as well as the Judgment it entered on those claims.[1]

## B.    Factual Background

### 1.    The parties

Carmen Wannamaker-Amos is a black woman born in 1954. JA157 ¶ 1. She has a degree in chemistry and attended medical school before embarking on a successful career in quality management. *Id.* ¶ 2. She worked in quality-related positions for automotive original equipment manufacturers ("OEMs") starting in 1986. *Id.* ¶¶ 3-4. Purem Novi is an OEM that manufactures exhaust systems for manufacturers such as BMW and Hyundai. (www.purem.com/en).

Purem Novi hired Wannamaker-Amos for a quality engineering role in 2013. JA157 ¶¶ 5-6; JA96:5-21; JA97:3-5. Wannamaker-Amos was an advanced

---

[1] To limit issues on appeal, Wannamaker-Amos abandons her age discrimination claims.

product/quality product ("AP/QP") engineer at Purem Novi's plant in Spartanburg, South Carolina. JA421:22 – JA422:3. She reported to the plant quality manager, who reported directly to the plant manager, Charl Greeff. JA158 ¶ 8.[2]

Purem Novi's quality function is headquartered in Novi, Michigan. JA158 ¶ 9. At all relevant times, the chief quality executive was Javad Hosseini. *Id.*; JA584:20-25. Hosseini played no role in hiring Wannamaker-Amos. JA585:1-15. Robin Shollack, a corporate quality manager in Novi, reported to Hosseini. JA79:20 – JA83:10; JA84:11-12; JA158 ¶ 10.

### 2.    Wannamaker-Amos's duties

Wannamaker-Amos was never the Spartanburg quality manager, and she never had responsibility for day-to-day quality assurance activities. JA158 ¶ 11. Instead, Wannamaker-Amos was responsible for implementing quality systems and troubleshooting customer complaints about defective parts. JA159 ¶ 16. Manufacturing supervisors and team leaders were responsible for inspection and compliance with the quality systems, and the quality manager was responsible for quality assurance duties. JA159 ¶ 18. Although Wannamaker-Amos consulted on

---

[2]    After Greeff left Purem Novi, there was a succession of plant and quality managers. In 2019 alone, Purem Novi had three different quality managers in Spartanburg (Lou Nespeca, David Pearson, and Sarah Bailey). JA587:17-20; JA651:23 – JA652:1; JA158 ¶ 14. At the time of Wannamaker-Amos's termination, there was no quality manager in Spartanburg. JA652:2-5.

4

questions that arose during production, she had no authority to direct production employees. When there was an issue on the floor, the quality manager resolved it with the production managers and team leaders. *Id.* ¶ 17; JA451:13 – JA452:2.

### 3. Purem Novi and others heralded Wannamaker-Amos's performance.

Purem Novi held Wannamaker-Amos in high regard. Shollack describes Wannamaker-Amos as "above and beyond" her peers. JA105:15 – JA65:10. Wannamaker-Amos's other colleagues and superiors also regarded her highly, as did third-party auditors. JA94:10-JA95; JA100:17 – JA101:6; JA101:13-25. Wannamaker-Amos worked long hours to earn this reputation. JA98:20 – JA99:23. Purem Novi chose Wannamaker-Amos to travel to Germany to implement her techniques and strategies abroad. JA106:13 – JA107:1; JA100:17 – JA101:6; JA107:11 – JA108:13.

### 4. Hosseini long wanted to terminate Wannamaker-Amos's employment.

Hosseini repeatedly tried to terminate Wannamaker-Amos's employment well before any issues underlying this case. Wannamaker-Amos was present for a phone call between Hosseini and quality manager Lou Nespeca. During a discussion about staffing, Hosseini commented, "Well, you're firing Carmen so you have an open space." JA530:19 – JA531:12. Shortly before the end of Shollack's employment, Hosseini informed Shollack that he had asked Greeff to fire

5

Wannamaker-Amos. JA84:17 – JA85:17. Hosseini falsely accused Wannamaker-Amos of not using software correctly when, according to Shollack, Wannamaker-Amos was the only one using it correctly. JA85:21 – JA86:4; JA86:19 – JA87:8. Richard Holland, a peer of Shollack's, also reported that Hosseini discussed firing Wannamaker-Amos. JA100:6-16; JA109:4-14.

Management protected Wannamaker-Amos as long as it could. Greeff, for example, told Wannamaker-Amos that, while Hosseini was trying to fire her, she was safe under him. JA565:6 – JA566:4; JA566:16-17).

Hosseini's desire to fire Wannamaker-Amos had nothing to do with her performance. Hosseini made clear why he disliked Wannamaker-Amos. While falsely accusing Wannamaker-Amos of not completing tasks, Hosseini remarked to Shollack, "You know how these black people are." JA88:11-20. Shollack testified that she was shocked, and she added: "[M]y face must have shown it because he changed right away and said, 'You know those southern people, they work very slow.'" JA88:20-22; JA89:5-9. To this day, Hosseini refers to black people as "colored people." JA619:2-7. Hosseini never had a black person reporting directly to him at the corporate level. JA108:14-17; JA620:17-19; JA108:14-17.

### 5. Hosseini also does not like women.

Hosseini's discriminatory attitude is not limited to black people. He treated women horribly as well. Shollack testified that Hosseini exaggerated any issue he

6

perceived with Wannamaker-Amos. But if a man did something improperly, Hosseini would make Shollack fix it. JA91 31:20-25. Shollack described, for example, how Hosseini would not hold a male quality manager accountable. When Hosseini sent Shollack and another female to fix the problems that the male manager caused, the manager called them "fucking bitches." JA90:3 – JA91:4; *id.* JA91:14-19; JA102:24 – JA103:19. Shollack reported the vulgar tirade to Hosseini, who did nothing, and nobody ever followed up with Shollack. JA103:7-19; JA104:3-12; JA104:20-25; JA109:20-22. In another example, Hosseini excused a male manager's failure to set up an inspection process by falsely blaming Wannamaker-Amos. JA92:1 – JA93:4; JA94:23 – JA95:1.

Hosseini demonstrated his disregard for women with Wannamaker-Amos. When Wannamaker-Amos was the only female in a meeting, Hosseini would always require that she take notes, Hosseini would not listen to her input, and he interrupted her when she tried to speak. JA543:17 – JA544:7.[3]

### 6. Purem Novi moves the Hyundai program from Alabama to Spartanburg.

In 2019, Purem Novi moved production of Hyundai parts from Alabama to Spartanburg. Wannamaker-Amos was not directly involved in the transition. JA159

---

[3] Hosseini had only two female direct reports (both white) during Shollack's tenure. JA108:21-JA109:3.

¶ 19. In May 2019, Purem Novi's plant manager, Andrew Breidigam, entrusted the quality engineering of the Hyundai lines to Wannamaker-Amos. JA32; JA433:24 – JA434:4. Wannamaker-Amos began her Hyundai duties in June. She continued to report to the quality manager (now, David Pearson). JA159 ¶ 20; *see supra* n. 2.

Purem Novi was 600 days behind when Wannamaker-Amos inherited the Hyundai program. JA436:6-13; JA160 ¶ 23. Pearson told Wannamaker-Amos that others were distancing themselves from the project because management viewed it as doomed. JA159 ¶ 21. The most pressing need at the time was to obtain approvals from Hyundai. This predicament required Wannamaker-Amos to focus intently on Hyundai's documentation and other requirements. JA159-60 ¶¶ 22, 24-25; JA436:25 – JA437:9. Wannamaker-Amos needed to expedite tasks like obtaining specifications from the customer, putting information in a centralized location, collecting samples, and translating Hyundai's documentation from Korean to English. JA437:11 – JA439:2. Purem Novi never criticized Wannamaker-Amos, claimed she was not doing enough, or asserted that she focused on the wrong priorities. Management, in fact, supported Wannamaker-Amos and praised her along the way. JA160 ¶¶ 26-28.

Wannamaker-Amos's hard work resulted in Purem Novi obtaining the necessary approvals from Hyundai. Purem Novi profusely praised Wannamaker-

Amos. Breidigam's boss, Dave Eppstein, called Wannamaker-Amos "a beast" for accomplishing the feat. *Id.* ¶ 30.

### 7. Wannamaker-Amos performed far better than peers at the Spartanburg facility.

The Hyundai program had, by far, the best quality record in Spartanburg. The plant also produced parts for BMW. JA165 ¶ 66. Wannamaker-Amos was not Purem Novi's quality engineer for the BMW business. *Id.* ¶ 67; JA546:10-18. The BMW team consisted solely of white individuals. JA533:2-7; JA437:11-25; JA197-99 (Resp. to Interrog. 17); JA172 ¶ 110.

In 2019, BMW complained ninety-five times, including nine times in one weekend.[4] By contrast, Hyundai complained only twice during the relevant time.[5]

### 8. The WCC missing pipe

Purem Novi produced two products for Hyundai: a WCC module and a UCC module. JA 712. On Thursday, December 19, a problem arose when Hyundai received a WCC module with a missing pipe. A third-party quality vendor had the

---

[4]     JA211-14; JA122:3-12; JA215-17; JA112:13-19; JA218-54. Many of these complaints are repeat complaints about the same issue. *E.g.*, JA211-14 (multiple repeat issues about broken valves, fit issues, wrong dimensions, wrong parts shipped, tailpipe offset, missing brackets, noise, torque fault); JA215 (same); JA218-36 (multiple complaints about incorrect parts); JA251-54 (repeated complaints about exhaust flap issue and tail tip fitment issue).

[5]     *See* JA264-65 (Resp. to RTP 5); *see also* JA381-86 (showing quality engineers for most of the complaints listed).

parts at the Alabama plant of another Hyundai supplier. JA508:7-16; JA161¶¶ 34-36; JA163 ¶ 45.

Wannamaker-Amos immediately requested the containment of all parts and photographs of each piece at issue. She also directed the third-party inspector to send nonconforming parts to Spartanburg. JA510:16 – JA511:13. Wannamaker-Amos sent Hyundai an immediate response with an initial five-panel report based on the available information. JA41. Wannamaker-Amos promised that Purem Novi would investigate further and that it would provide a countermeasure. She also explained: "[T]oday was about initial investigation and containment of the issue." JA35.

Wannamaker-Amos and others from different teams began working on a countermeasure. JA162 ¶¶ 40-41; JA163 ¶48; JA40; JA1790-80; JA380; JA511:15-19; JA519:15-18).[6] In simple terms, a countermeasure is a fix for the problem.[7] But

_____

[6]    One important part of a response is to establish a "clean point," which is a designation of the parts that have been fully inspected after a problem is identified. JA718. A clean point requires the inspection of all parts at each location. There were three locations at which the parts were located: Spartanburg, another Hyundai supplier's plant in Alabama, and the Hyundai plant itself in Alabama. Hyundai staffed both locations in Alabama with a third-party contractor. JA162 ¶¶ 42-43.

[7]    "Countermeasures are any actions taken to try and fix a problem before it becomes worse. They can be anything from fixing a flaw in a process to hiring new employees to increase production." https://www.qualitygurus.com/countermeasure-vs-solution-in-an-improvement-project/#:~:text=Countermeasures%20are%20any%20actions%20taken,problem%20before%20it%20becomes%20worse (last accessed August 8, 2023).

determining the correct countermeasure is no simple task. It requires a determination of root cause and developing specific steps to correct and prevent future occurrences. JA178 is an example of a countermeasure.

Hyundai was in plant shutdown the week after December 19, and Wannamaker-Amos and others were off work through January 7. JA162 ¶ 44. Bailey had just voluntarily resigned. JA181; JA181; JA156:11-24; JA163 ¶ 52. While on vacation, Wannamaker-Amos continued to work with others, including Hosseini, on a countermeasure. JA182-88. Wannamaker-Amos also kept Hyundai apprised of the status. JA 162-63 ¶ 44-46; JA 164 ¶¶ 56-57; JA189-94.[8]

The multi-departmental team kept working on a countermeasure. JA163 ¶ 49; JA164 ¶¶ 58, 60, 62; *see* JA1790-80. As of January 9, Wannamaker-Amos had not received the requisite data or the non-conforming parts she requested. JA163 ¶ 50. Although there was much left to do, Wannamaker-Amos had done everything she could have done at that point. JA164 ¶¶ 54, 61.

Although the District Court faulted Wannamaker-Amos for not responding to Hyundai, that was not her job. Hosseini insisted on directing the response, probably because Hyundai demanded that Hosseini respond. JA163 ¶ 47; JA127:11-18; JA128:12-17; JA129:8-13; JA131:7-9. Wannamaker-Amos never ignored or

---

[8]　　Purem Novi falsely claimed also that there were no communications between Wannamaker-Amos and Hyundai until early January. JA126:7-12.

violated any directive from Hosseini to send a response to Hyundai. JA 164 ¶¶ 54, 61. Purem Novi never produced any response to Hyundai, let alone one that Wannamaker-Amos failed to send. JA163 ¶ 47;[9] *see also* JA164 ¶ 61; JA137:21 – JA138:7-10.

### 9.      Hosseini terminates Wannamaker-Amos based on false statements.

Hosseini prepared a document he secretly sent to Breidigam and the human resource manager, Kelly Kosek. JA45-51 ("Supporting Evidences Doc").[10] Nobody shared the Supporting Evidences Doc or its contents with Wannamaker-Amos; nor did anyone give her a chance to respond to the claims it contains. The first Wannamaker-Amos ever knew of the Supporting Evidences Doc was years later during this lawsuit. JA 161 ¶ 31; JA166 ¶ 69; JA171 ¶ 106. In obvious recognition of the document's many problems, Purem Novi did not share it with the EEOC. *See* JA276-297.

---

[9]      Purem Novi cited JA60 as a "January 10, 2020 5 panel form." (DE 67 at 9, 18). But that document is materially different from another version Purem Novi claims to be the same document. Two aspects of the corrective action differ, and another date of January 21 appears. JA131:3-6; JA195-96.

[10]      Although Hosseini used one of Purem Novi's performance improvement plan forms, Hosseini never recommended that Purem Novi put Wannamaker-Amos on a PIP. Hosseini closed by saying, "(p)lease initiate action as discussed." JA43. By this, Hosseini meant termination. JA643:2-4.

### a.    The significant damages lie

Hosseini's cover email claims that the Supporting Evidences Doc, "contains evidence() of poor performance and lack of follow through with job requirements by QE assigned to Hyundai program." JA43. Hosseini also asserted that Wannamaker-Amos "caused several customer complaints and escalations and significant damages to the company." *Id.*

Purem Novi held this document back for as long as possible. And it did so for good reason: There is no justification for Hosseini's claims. For example, none of the issues Hosseini wrote about "caused several customer complaints." *No* complaints resulted from Wannamaker-Amos not having systems in place.

After Wannamaker-Amos sued, Purem Novi tried to distance itself from Hosseini's claim that Wannamaker-Amos's performance resulted in "significant damages to the company." Purem Novi could not identify *any* damages or incurred costs, let alone any that Wannamaker-Amos caused. JA151:20 – JA152:5; JA152:21 – JA153:5; JA153:10-14.

To mitigate Hosseini's falsities, Purem Novi feebly claimed that Hosseini's assertion about "significant damages" were not the basis for Wannamaker-Amos's termination. JA151:20 – JA152:5. That argument never made sense. Hosseini made the "significant damages" statement in his justification for termination. JA43. He also made the termination decision. JA152:6-8.

Hosseini then listed eight examples of issues upon which he based his decision. As Wannamaker-Amos shows below, none of the eight withstood scrutiny in discovery.

### b.     Purem Novi did not approve safe launch containment.

Hosseini complained in January 2020 that safe launch containment inspection was not in place as of November 5, 2019. JA45. [11] Purem Novi knows that this does not show any failure by Wannamaker-Amos.

Wannamaker-Amos agrees that: (1) as of the beginning of November, Purem Novi did not have safe launch containment in place; and (2) Purem Novi should have installed safe launch containment at the start of production. JA475:3-5; JA478:21 – JA479:7; JA 166 ¶ 73. Wannamaker-Amos made this point at the time, but Purem Novi rejected her requests to implement containment. JA166 ¶ 74. Hosseini's efforts to later blame Wannamaker-Amos for management's rejection of safe launch is a perfect example of pretext.

Purem Novi's policy states: "The setup of a containment inspection is a management decision. The Plant Manager makes the decision to set up a containment inspection based on a proposal by the Quality Manager of the site."

---

[11]     Hosseini claims that safe containment should have been in place in August when saleable parts were in production. JA45; JA277; JA280. Purem Novi's own production logs show that there was no production in August. JA300-69.

JA299 ("Responsibilities"). Wannamaker Amos was neither the plant manager nor the quality manager. Nor did she have the purchase order authority necessary to implement safe launch, which requires, for example, the hiring of contractors. JA166-67 ¶¶ 75-76.

Purem Novi always knew that safe launch containment was not in place, and it did not care at the time. In his deposition, Hosseini admitted that he knew safe launch containment was not in place in September or October. JA648:14-21.[12] Hosseini also never discussed any concerns about safe launch containment with Wannamaker-Amos. JA166-67 ¶¶ 75-79; JA475:9-14. Nor did he document that there was any purported issue at the time. JA659:12-15; JA666:4-8; JA675:4-14; JA680:3-25; JA685:10 – JA686:23; JA694:7-17. [13]

---

[12]     The absence of safe launch containment could not be missed. Safe launch is a process that involves space and effort. Contractors in distinguishable uniforms work in a large, cordoned-off area in the plant. JA167 ¶ 77. There would be no way, for example, to conduct a walkthrough on October 1 and not notice the absence of safe launch containment. *Id.* ¶ 79. Purem Novi claimed that Hosseini worked in Spartanburg for about six weeks to compensate for Wannamaker-Amos's (undocumented) shortcomings. JA277. That also is not true by anyone's account. *See* JA144:11-24. Hosseini claims that he spent 70-80% of his time on Hyundai issues (well before there was any complaint). JA674:11-17; JA614:20 – JA615:3. If Hosseini was so focused on Hyundai quality systems in Spartanburg, he could not have missed the lack of a safe launch containment.

[13]     When questioned as to why there is no documentation of Wannamaker-Amos's purported failures to implement quality basics, Hosseini babbled and then stated that he never documented such things. JA685:14 – JA686:23. The notion that

15

On November 1, Hosseini finally ordered the establishment of safe launch containment. JA46. Hosseini testified that safe launch containment was in place after November 5. JA652:21-23. This was months after Wannamaker-Amos requested it.

### c. First piece inspection was in place.

Hosseini falsely documented that there was no first-piece inspection in place. JA46-47. The District Court erred in apparently accepting Purem Novi's claim that production was ongoing without the inspection process. JA717.

First-piece inspection is performed at the assembly line by production employees. JA167 ¶ 80; JA146:24 – JA148:17. There is a station (stand-up factory desk) located at the line with a sample product and sheets employees use to document the inspection. JA167 ¶ 80; JA480:4-13.

Quality engineering sets up the process but is not responsible for conducting or supervising the process. JA168 ¶ 82; JA656:18 – JA657:5. Wannamaker-Amos set up the station, and she stocked it with a sample part. JA167 ¶ 81. In other words, she did her job.

Hosseini claims to have taken a picture on October 1, showing no sample part at the UCC inspection station. If Hosseini observed this situation, he certainly kept it a secret. Wannamaker-Amos never observed the absence of a sample part at the

_____

Purem Novi does not document problems with quality systems is baffling, especially given the requirement that it audit processes in writing.

16

station, and nobody else reported it either. JA168 ¶¶ 85-86. At most, this was an isolated occurrence, as Hosseini documented it only once. JA657:12 – JA658:10; JA658:18-24. Wannamaker-Amos cannot comment on what happened that day because Hosseini did not have her accompany him. *Id.* ¶ 86; *see* JA658:25 – JA659:15.[14]

Finally, the isolated incident Hosseini claims to have observed has nothing to do with the product at issue. Hosseini claims that he observed the issue on the UCC line. JA46-47. The Hyundai missing pipe issue involved a WCC part.

### d.    WCC PFMEA not reviewed or updated

Hosseini also alleged that Wannamaker-Amos did not "review[] or update[]" the process failure mode effects analysis form ("PFMEA"). JA47. Purem Novi updates a PFMEA form when it changes the manufacturing process. JA484:1-5;

---

[14]    Purem Novi's post-termination zeal to disparage Wannamaker-Amos involves myriad other lies. Purem Novi claimed, for example, that Hosseini visited Spartanburg on October 1 in response to multiple complaints from Hyundai. JA149:11-22. There were no complaints as of October 1. JA150:15-19; *see* JA273. Hosseini got involved in Spartanburg because the quality manager quit in December. JA442:9-14; JA156:11-24. Without any quality manager, Hosseini would perform those duties, including walking and inspecting the production lines to ensure that production was adhering to Purem Novi's quality policies. JA158 ¶ 14; *see* JA618:14-21 (Hosseini discussing how he would fill in at the plants in the absence of a quality manager).

17

JA661:4-8.[15] The PFMEA is created by and updated by advanced engineering, not quality engineering. JA168 ¶ 88; JA465:25 – JA466:1; JA483:11-13). Wannamaker-Amos's role in the process was not to update the PFMEA. Instead, she provided input on how significant product characteristics would be monitored or measured. JA464:14 – JA465:1; JA465:15-21.

Hosseini alleged that the PFMEA for WCC was "not reviewed or updated" based on a November 7 email he sent to Wannamaker-Amos. JA47; JA661:19-23. That is not what the email says. Hosseini's email merely asked Wannamaker-Amos to confirm whether "any review after this date has taken place to include issues found during launch and trials." JA47. Wannamaker-Amos responded. *Id.*; JA169 ¶ 89. At his deposition, Hosseini ultimately conceded that he never suggested to Wannamaker-Amos that he was dissatisfied with her response. JA664:20 – JA665:14; JA169 ¶ 89.

Hosseini's effort to cite the PFMEA included another lie. Hosseini asserted that the PFMEA was updated in June while Wannamaker-Amos was involved with the Hyundai lines. JA664:10-11. When confronted, Hosseini acknowledged that the

---

[15]    The PFMEA sets forth what is critical to the customer and to predict any failures in the process beforehand so systems can be established to avoid them. JA662:1 – JA663:19.

18

PFMEA was updated May 17. JA664:12-14. Wannamaker-Amos was not involved with the Hyundai program in May. JA169 ¶ 90.

### e.    Control plan not updated

Hosseini also secretly justified termination with the allegation that Wannamaker-Amos did not update the WCC control plan. JA47-48. This control plan was not an issue at the time. In early November, Hosseini asked Wannamaker-Amos for a copy of the control plan, which she provided. JA47; JA169 ¶ 91; JA665:19-22. That was the extent of it. Hosseini never told Wannamaker-Amos of any concern with the control plan not being up to date. JA666:4-16; JA667:10-19; JA169 ¶ 92; JA486:5-13; JA487:10-15. Again, if this had been an issue, Hosseini knew about it in October. JA666:17 – JA667:2.

Hosseini also documented that WCC control plan was dated May 7, while the PFMEA was from June 17. JA48. Hosseini stated that this shows that the "(c)ontrol (p)lan has not been updated to reflect the potential changes that may have occurred in PFMEA review." *Id.* The word "potential" is important here because not all PFMEA changes would require a control plan change. JA462:4-13.

Hosseini argued that the change to the process was the lack of an automated gauge and that Wannamaker-Amos erred in not documenting the lack of an automated gauge. JA687:14 – JA689:15. But that is not true either. First, Purem Novi was not changing the process to eliminate the automated gauge. Purem Novi

19

had not received one yet, and Wannamaker-Amos was not involved in ordering it. JA169 ¶¶ 93-94. Secondly, Wannamaker-Amos documented the absence of the automated gauge, and Hosseini that. JA673:7-10; *see* JA50 §6.1.1.

### f.    Critical characteristics monitoring form

Relatedly, Hosseini raised another complaint he never previously raised or discussed with Wannamaker-Amos. Hosseini asserted that Wannamaker-Amos put no measurements on a critical characteristics monitoring form. JA48; JA672:2-10; JA675:4-23).[16] But that measurement required the automated gauges that Purem Novi had not obtained. JA169 ¶ 94; *see* JA673:7-13. Again, Hosseini knew his allegation was false when he made it.

### g.    Red box management not in place

Another demonstrable lie is Hosseini's claim that red box management was not in place. JA49. There is no evidence of that. Even Hosseini's photographs show the process being in place. At most, Hosseini alleged a single anecdote of production employees not following the process.

The red box allegation arises from a single incident Hosseini claims to have observed three months earlier. Again, if he did observe it, he never discussed the issue with Wannamaker-Amos. Hosseini took a picture of twelve parts sitting next

---

[16]    Hosseini claims he never looked at this form in September, October, or November even though he claims to have been spending 80% of his time on Hyundai. JA674:21-23; JA672:11-17; JA674:11-17.

to a container. There is no proof of how they got there, or when. JA49. Hosseini never told Wannamaker-Amos about it, she never saw it, she knew nothing about it, and nobody ever discussed it with her. JA170 ¶ 98.

As for setting up red box management, Wannamaker-Amos confirmed in her audit that employees contained parts properly during her observation. Purem Novi had not yet provided actual red box containers (i.e., baskets), which Wannamaker-Amos documented and which she had attempted to obtain. JA50 § 6.2.4; JA169-70 ¶ 95; JA497:2-11.

Hosseini also complained that employees were using an orange crate, rather than a red basket. JA49. That was the common practice about which everyone was aware. JA170 ¶ 96. There is no one accepted "red box" container. Even Purem Novi's policy shows different containers. JA169-70 ¶¶ 95-97; JA377-78. Hosseini again complained about something he: (1) knew about at the time; and (2) that he did not raise as an issue with Wannamaker-Amos. JA170 ¶ 97.

### h.    Process audit not reflecting reality

In January 2020, Hosseini documented that an August 2019 audit did "not reflect reality." JA 50-51. That is not true either, which is likely why nobody ever raised this issue.

As part of her duties, Wannamaker-Amos performed an internal audit in August before the start of production. JA370-74. No one, including Hosseini,

disagreed with Wannamaker-Amos's findings. JA171 ¶¶ 102-03; JA694:7-14; JA695:24 – JA696:16.

Hosseini was not present in August when Wannamaker-Amos performed her audit. JA170 ¶ 101.[17] Again, Hosseini focused his complaint on the lack of an automated gauge, but he and everyone else knew that Purem Novi had not obtained one yet. JA689:6 - 690:22.

### i.    Wannamaker-Amos did not respond to Hyundai on time

Hosseini's next assertion lies at the heart of the District Court's decision to grant judgment. Concerning the WCC missing pipe issue,[18] Hosseini assailed Wannamaker-Amos for not providing a response that Hyundai requested from Hosseini. JA51. In his written justification for termination, Hosseini cut and pasted an email from Hyundai to three white male executives (including Hosseini). JA51. Hyundai did not address its email to Wannamaker-Amos. JA520:18 – JA521:7. Hyundai addressed it to Hosseini and other executives about whom Hyundai complained. Hyundai complained about *their* lack of responsiveness to three issues,

---

[17]    Hosseini apparently does not claim that the audit did not reflect the reality in August. Instead, five months after the audit, Hosseini contended that Wannamaker-Amos's August audit did not accurately reflect conditions in January. JA50.

[18]    *Supra* S.O.C. § C(8).

and never complained about Wannamaker-Amos. *Id.* Only the third issue relates to the Hyundai WCC missing pipe issue.

Hosseini knew that his reference to the missing pipe issue was misleading. Hosseini knew that he was working on the requested information. Hosseini also knew that he was directing the response, not Wannamaker-Amos. *Supra* S.O.C. § C(8).[19] Finally, Hosseini knew that Wannamaker-Amos had done everything she could have done at that point. *Id.*

### 10. Purem Novi violated its own policies that call for performance improvement efforts and prior warnings before termination.

Purem Novi maintains a company-wide "Performance Improvement Policy" and "Disciplinary Code." JA72-77. Purem Novi's policy calls for progressive discipline. Depending on the offense, it enumerates several steps, including verbal coaching, a written warning, a second written warning, a final written warning, and then termination. JA73.

Purem Novi's own description of the infraction for which Wannamaker-Amos was accused demonstrates how badly Purem Novi disregarded its policy. Purem Novi repeatedly claimed that Hosseini terminated Wannamaker-Amos for

---

[19]    Citations to "S.O.C." refer to the State of the Case section of this Brief.

"complete negligence." (DE 67 at 6, 15).[20] Thus, if Wannamaker-Amos had been culpable, Purem Novi's policy calls for a written warning, at most.

The Disciplinary Code identifies "Offences Relating to Performance of Work," including "Negligence or carelessness/poor quality of work and/or not working to standards" (first written warning), and "(l)ow productivity, unsatisfactory work performance" (first written warning). JA74. The Code further states: "All corrective actions will generally be given in writing using a warning form and recorded in the employee's personnel file." JA77.[21]

Wannamaker-Amos never received any verbal counseling, any form of warning, or a performance improvement plan. JA166 ¶ 70; JA604:16 – JA605:2; JA605:11-20). This is the rare case in which no prior documentation exists of anyone *ever* criticizing the plaintiff's performance:

> Q.    Has Purem Novi identified any documentation in which anybody at Eberspaecher raised any concern about Ms. Wannamaker-Amos' performance, other than the [Supporting Evidences Doc]?
>
> A.    No.

JA151:6-10.

---

[20]    Wannamaker-Amos cites Purem Novi's memorandum under Rule 30(a)(2). Fed. R. App. P. 30(a)(2).

[21]    To ensure that all offenses are treated equally, Purem Novi's policy states: "HR will generally be consulted before any action is taken to ensure consistency." *Id.*

24

On January 10, Purem Novi summoned Wannamaker-Amos to the human resources office where it summarily fired her. JA166 ¶ 71; JA172 ¶ 109. Although Hosseini was aware of Purem Novi's policies, he never consulted them in deciding to fire Wannamaker-Amos. JA603:7 – JA604:15; JA605:3-20. Hosseini never considered warning Wannamaker-Amos because "I did not have a reason to." JA633:23 – JA634:8.

### 11. Complaints from Hyundai increased after Wannamaker-Amos's termination.

After Wannamaker-Amos's termination, the number of Hyundai complaints spiked. Hyundai made ten complaints in 2020. JA265 (Resp. to RTP 5). As with the BMW situation, Purem Novi disciplined no one. JA115:3-4; JA116:13-22 & JA274.

### 12. Purem Novi tried to justify Hosseini's decision with more false assertions.

#### a. Purem Novi falsely claimed that Hosseini made his decision based on production records.

There is no contemporaneous evidence that Wannamaker-Amos did anything wrong. Purem Novi tried to compensate by falsely stating that certain documentation shows quality problems. Before the EEOC, Purem Novi claimed: "When reviewing the **production logs** in early December to understand how such mistakes could have occurred, Hosseini uncovered multiple mistakes by Amos **in each report**." JA277; JA257 (Resp. to Interrog. 6, emphases added). Purem Novi really went off the deep end by stating further that the mistakes found in production logs "contributed to the

production and shipment of productive parts." JA277. Purem Novi admitted that the production logs are the only documents to which Hosseini referred. JA140:23 – JA141:1. Purem Novi never shared these logs with the EEOC because Purem Novi knows the logs refute its claims.

The production logs contain no information about quality. *See* JA300-69. They only show the number of parts produced. *Id.*; JA143:1-6; JA639:1 – JA640:2; JA166 ¶ 72. Purem Novi knew that production logs do not reflect quality issues. Even Hosseini disputed Purem Novi's representation that he referred to them. JA638:18-21. Purem Novi just made this assertion up after the fact. And it did so knowing that the referenced documents contained no information about quality.

> ### b. Purem Novi falsely claimed that Wannamaker-Amos caused it to produce and ship bad parts.

As noted above, Purem Novi also told the EEOC that purported failures on the part of Wannamaker-Amos caused it to produce and ship bad parts. JA277. That statement also is indefensible.

Purem Novi later acknowledged that the failure to have safe launch containment does not cause defective parts. JA153:15-20. Neither was a purported failure to review or update a PFMEA form. JA153:21 – JA154:8. Nor was a purported failure to update a control plan. JA154:9-11. A purported failure to update a critical characteristics monitoring form also would have nothing to do with the shipment of bad parts. JA154:12-16. Similarly, the purported failure to have a red

box management in place would not result in the production or shipment of bad parts. JA154:19-23. Wannamaker-Amos's audit certainly had nothing to do with any shipment of bad parts. JA155:1-4. Most importantly, any purported lack of proper and on-time response to Hyundai could not have resulted in the shipment about which Hyundai already complained. JA155:5-8.

Purem Novi's misrepresentations are egregious. But the motive is clear. Purem Novi compounded the pretext issues because it could never back up Hosseini's original claims in the Supporting Evidences Doc. So Purem Novi made up another story and kept the documents under wraps for as long as possible. That tactic may have fooled the EEOC, but it backfired in discovery.

## SUMMARY OF ARGUMENT

The District Court's pretext findings under *McDonnell-Douglas* are belied by its findings about the same issues in the prima facie case analysis. The District Court misread this Court's decision in *Cowgill*, which catalogs several of Wannamaker-Amos's pretext showings. The District Court also erred by parsing evidence, rather than viewing it holistically. The District Court should not have allowed Purem Novi to escape its many debunked rationales. The District Court also grossly erred by discounting Wannamaker-Amos's testimony and by making findings that are unsupportable.

**STANDARD OF REVIEW**

This Court reviews the grant of summary judgment de novo. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 117 (4th Cir. 2021).

**ARGUMENT**

**A.    The District Court's pretext rulings conflict with its prima facie rulings.**

The District Court's decision contains an irreconcilable conflict that precludes judgment as a matter of law. The District Court analyzed Wannamaker-Amos's claims using the familiar framework established fifty years ago in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973):

> The McDonnell Douglas framework is comprised of three steps: (1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory.

*Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (citations omitted).

Purem Novi challenged Wannamaker-Amos's ability to establish a prima facie case. Purem Novi argued that Wannamaker-Amos cannot show that she "was performing her job duties that met her employer's legitimate expectations." JA728 (citing *Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005)). It relied on Wannamaker Amos's purported failure to "respond to Hyundai's email regarding a

28

lack of responsiveness on the missing pipe issue after Mr. Hosseini instructed her to do so." JA729; *see* JA734 (referring to Wannamaker-Amos's "failure to respond to Hyundai's email.").

The District Court correctly noted that Wannamaker-Amos contradicted Purem Novi's assertion that she did not respond to Hyundai's concerns. The District Court, for example, noted that Wannamaker-Amos "could not provide a clean point serial number regarding the missing pipe up to the time of her employment termination because she did not have the information she needed yet from Alabama; and she was never instructed to send the response to Hyundai's email." JA729. Thus, the District Court correctly found that disputed issues of material fact exist as to Purem Novi's assertion that Wannamaker-Amos did not respond to Hyundai. JA729-30.

For the second stage of *McDonnell Douglas*, the District Court noted that Purem Novi again relied on Wannamaker-Amos's purported failure to respond to Hyundai. JA730-31. And that set the stage for the primary contradiction in the District Court's Order.

Turning to the third step of *McDonnell Douglas*, the District Court's prima facie case conclusion that Wannamaker-Amos created disputed issues of material fact should have been dispositive. But the District Court did an about face and abandoned its prima facie case findings about the response to Hyundai. JA733-34.

29

The same disputed issues of material fact that preclude summary judgment as to the prima facie case also preclude it as to pretext. This conflict alone requires reversal of the District Court's Order. In *Guessous*, this Court reversed summary judgment when it determined that a district court's prima facie case finding that the employer filled the plaintiff's position was "internally inconsistent" with its pretext finding that the employer did not fill it. *Guessous*, 828 F.3d at 220. That same conflict exists here.

Pretext evidence is no different from prima facie evidence. If evidence used to establish a prima facie case also undercuts the employer's purported reasons, that should end the inquiry. "[T]he trier of fact may . . . consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom … on the issue of whether the defendant's explanation is pretextual.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (citations omitted) (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255, n. 10 (1981) (noting that prima facie "evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation."); *see Lettieri v. Equant Inc.*, 478 F.3d 640, 649 (4th Cir. 2007).

**B.    The District Court erred in trying to limit this Court's decision in *Cowgill v First Data Technologies*.**

A jury may infer pretext from: (1) an employer's deviation from normal procedures, (2) the citation of purported issues that arose in a prior month, or (3) the failure to provide coaching on purported performance issues. *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 383 (4th Cir. 2022). All of the listed circumstances exist in this case. Without warning, Hosseini terminated Wannamaker-Amos's employment based on misrepresented and exaggerated issues he never raised at the time, and for which there is no contemporaneous documentation. Supra S.O.C. § C(9)(b)-(i).

*Cowgill* is just the most recent example of this Court's settled precedent. Three years earlier, for example, this Court explained that "the jury [may] reasonably … question[] whether firing (the plaintiff) for one *infra*ction that did not require termination was such an extreme overreaction as to be pretextual" because the employer's "policy permitted (it) to impose other, less severe sanctions." *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 727 n. 4 (4th Cir. 2019) (cleaned up, citing *Okoli v. City of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011) et al.);[22] *cf.*

---

[22]    The District Court also erred in not relying on Purem Novi's own policy just because Hosseini claimed, in reply materials, that he doesn't follow it. JA737 ("Mr. Hosseini testified that he was aware of the defendant's policies but never documented issues in his 17 years of employment with the defendant.") The failure to follow policy is not a defense. Rather, it is an independent basis for finding pretext. *E.g.*, *Vaughn v. Metrahealth Cos.*, 145 F.3d 197, 203 (4th Cir. 1998)

*Hernandez v. Fairfax Cty.*, 719 F. App'x 184, 189 (4th Cir. 2018) (summary judgment reversed because jury could find that sanction for violation was too severe).

Seventeen years before *Cowgill*, this Court also explained that a jury can infer pretext from a decision-maker's effort to secretly build a file of issues never discussed with the plaintiff. *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 403, 407 (4th Cir. 2005); *see also Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502-03 (4th Cir. 2001). This is a classic "papering the file" situation. Documentation created for the first time at termination is evidence of pretext if it relies on past events for which there is no contemporaneous documentation. *E.g.*, *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 239-40 (5th Cir. 2015) (citations omitted);

_____

("Metrahealth's failure to follow its own Manual certain makes the attempt to use the manual to justify discharging Vaughn pretextual"); *Alvarado v. Board of Trustees of Montgomery Cmty. Coll.*, 928 F.2d 118, 122 (violation of promotions policy and policy on filling position with incumbent sufficient for showing of pretext); *Hamilton v. 1st Source Bank*, 895 F.2d 159, 162 (4th Cir. 1990) (employer's failure to follow established procedures for handling perceived deficiencies in the performance of its employees sufficed as pretext evidence for employee fired for performance deficiencies); *Herold v. Hajoca Corp.*, 864 F.2d 317, 320 (4th Cir. 1988) (deviation from prior practice in layoff context evidence of pretext in ADEA case); *Stiles v. General Elec. Co.*, No. 92-1886, 1993 U.S. App. LEXIS 2870, **11-12 (4th Cir. Feb. 12, 1993) (deviation from layoff selection policy evidence of pretext)*;Mooberry v. Charleston S. Univ.*, Civ. Action No. 2:20-cv-00769, 2022 U.S. Dist. LEXIS 6803, at *9 (D.S.C. Jan. 13, 2022) (employer's explanation for not documenting issues only raises an issue of fact).

*Bassett v. City of Minneapolis*, 211 F.3d 1097, 1107 (8th Cir. 2000) (collecting cases); *Few v. Yellow Freight Sys.*, 845 F.2d 123, 124 (6th Cir. 1988) (building of an adverse file on an employee may evidence pretext).[23]

The District Court improperly distinguished *Cowgill* because it erroneously believed that this Court based *Cowgill* on comparator evidence. JA736-37. The District Court cited the wrong part of *Cowgill*. The discussion about comparators in *Cowgill* precedes the principles cited by Wannamaker-Amos. *See Cowgill*, 41 F.4th at 382-83. In other words, the *Cowgill* Court gave independent reasons for reversing summary judgment, and the District Court focused on the wrong one.

The *Cowgill* Court specified that the principles relied on by Wannamaker-Amos were "as an additional layer of pretext evidence" on top of the comparator evidence. *Id.* at 383. Likewise, the next paragraph in *Cowgill* begins with "Separately," and it discusses that a finder of fact can infer pretext from an employer's deviation from its usual procedures and evidence of an employer "search[ing] for and f[inding] a single nugget" to rely on. *Id.* This Court also recognized that it was "highly suspicious" that the employer "failed to coach" the

---

[23]     The process of papering an employee's file also has been cited in the retaliation context to infer motive. *E.g.*, *McGregory v. Crest/Hughes Techs.*, 149 F. Supp. 2d 1079, 1091 (S.D. Iowa 2001); *Harris v. Richards Mfg. Co.*, 511 F. Supp. 1193, 1198, 1202 (W.D. Tenn. 1981), *aff'd in part and rev'd in part on other grounds*, 675 F.2d 811 (6th Cir. 1982).

plaintiff when there existed a plan to do so. *Id.* Wannamaker-Amos relied on these rationales from Cowgill to show pretext. None of them relate to the earlier discussion about comparator evidence. DE 68 at 31.

The District Court remarked: "[T]here is no evidence of anyone in human resources questioning how quickly the plaintiff's employment was terminated." JA737. That nobody did their job or required compliance with company policy is hardly grounds for dismissing a case. Nor did Purem Novi ever make this argument, or produce any witness from human resources.[24]

Unfortunately, the District Court went even further and added another reason never raised by Purem Novi in its Motion: "[T]here is no evidence that Mr. Hosseini treated the plaintiff differently than other employees who were terminated from employment." *Id.* This rationale also gets it backward. The comparison in a disparate treatment case is not between terminated employees. The issue is whether employees outside the protected class were treated better than the plaintiff. *Young v. UPS*, 575 U.S. 206, 213 (2015); *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n. 11 (1976) (citing *McDonnell Douglas*, 411 U.S. at 804; *Reeves*, 530 U.S. at 151-

---

[24]     The lack of management witnesses supporting Purem Novi highlights another rare aspect of this case. Purem Novi did not produce a single fact witness to corroborate any of Hosseini's assertions. Not one member of management employed during Wannamaker-Amos's tenure has said one disparaging thing about her, other than Hosseini.

52; *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 211-12 (4th Cir. 2014). And for that, Wannamaker-Amos has provided ample evidence. *Supra* S.O.C. § C(7) & nn.4-5.

Likewise, the District Court reasoned that there is no evidence that Hosseini "deviated from his usual method of discipline." JA737. What method of discipline? There was no evidence of Hosseini disciplining any white employee. Wannamaker-Amos was the only black employee, and Hosseini fired her. The absence of evidence that Hosseini treated whites or males as he did Wannamaker-Amos can only suggest discrimination. The Record, for example, reflects far worse quality problems with programs run by white employees. *Supra* S.O.C. § C(7). Granting judgment because the employer never held individuals outside the protected class accountable stands Title VII on its head.

In short, the District Court imposed artificial barriers to Wannamaker-Amos's case that offend Title VII's text and purpose. Cases such as *Cowgill*, *Westmoreland*, and *Okoli* properly set the bar, and Wannamaker-Amos easily cleared it.

## C.  The District Court erred in finding that Wannamaker-Amos failed to respond to Hyundai.

For the pretext analysis, the District Court focused primarily on Hosseini's last accusation: That Wannamaker-Amos failed to respond to Hyundai. For the reasons below, Purem Novi's arguments about the Hyundai response teem with disputed issues of material fact.

35

### 1. The District Court erred in relying on Wannamaker-Amos's regular duties.

The District Court made an unwarranted leap in logic by blaming Wannamaker-Amos for not responding to Hyundai. The District Court reasoned that Wannamaker-Amos's argument failed because she dealt daily with Hyundai. JA734. For many issues, that is true. For this issue, however, Hosseini assumed responsibility for communicating with Hyundai. *Supra* S.O.C. § C(8).[25]

### 2. Purem Novi knows that Wannamaker-Amos did all she could have done at the time.

The District Court's decision contains another inherent inconsistency. The District Court premised its rejection of Wannamaker-Amos's explanation on the incorrect notion that there was a response that she failed to send. JA 733 ("she was never instructed to send the response"). At the same time, the District Court also erred in adopting Purem Novi's assertion that Wannamaker-Amos "failed to complete" her investigation of the missing pipe issue. JA736.

While both findings are erroneous, they could never both be true. If Wannamaker-Amos failed to complete her investigation, then there was no response to send. Likewise, if there existed a response that was ready to be sent, then Wannamaker-Amos must have completed her investigation.

---

[25] In fact, a Hyundai representative reportedly called Hosseini to complain that Hosseini had not responded to Hyundai's January 7 email. JA137:6-14.

36

There was no response to send when Hosseini fired Wannamaker-Amos, but that does not suggest a failure by Wannamaker-Amos to complete an investigation. As discussed above, Hyundai wanted a completed countermeasure. *Supra* S.O.C. § C(8). Hosseini knew that was impossible at the time. Not only had Wannamaker-Amos not received the parts, but the countermeasure required work from other teams like process engineering. *Id.* When Hosseini fired Wannamaker-Amos, there was nothing she could have done that she had not completed. *Id.* [26]

Again, the District Court made exactly these findings earlier in the Order. JA729-30. The District Court's decision to go the other way later in the decision merely highlights the disputed nature of the material facts.

### 3. The District Court erred in claiming that documentation existed of Wannamaker-Amos's failure to respond.

The District Court found that "documentation exists about the plaintiff's performance issues in the [Supporting Evidences Doc]," including her lack of a response to Hyundai. JA736. Respectfully, there is no documentation other than the Supporting Evidences Doc. If the District Court meant that the challenged

---

[26] The District Court erred in stating that Wannamaker-Amos "relied on and email from Sejong USA, one of defendant's other customers." JA720-21. There was confusion during Wannamaker-Amos's video deposition about the form being discussed. Wannamaker-Amos clarified, however, that the form about which she was questioned is not the form to which she was referring. JA518:4-7. Wannamaker-Amos never stated that she failed to provide something she was to provide. JA728 (citing JA521).

Supporting Evidences Doc is proof, the District Court missed the point. The issue is not whether an employer later papers up a file of allegations. The issue is whether there is contemporaneous documentation of the purported issues because the absence of such documentation shows pretext. *Smith v. CSRA*, 12 F.4th 396, 421 (4th Cir. 2021) (citing *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 575 (4th Cir. 2015)); *Nichols*, 251 F.3d at 502-03 ("The jury could have concluded that the last-minute documentation of . . .job performance supports the inference (of) contrived . . . performance deficiencies . . . in order to create the appearance of a nondiscriminatory reason"); *cf.* Guessous, 828 F.3d at 218-19 (lack of contemporaneous documentation supporting employer's purported reason creates genuine issue of material fact as to pretext). The District Court, however, overlooked the lack of contemporaneous documentation.

### 4. The Hyundai issues had nothing to do with Hosseini's desire to fire Wannamaker-Amos

The District Court's reliance on disputed issues about Hyundai missed the larger point. Hosseini's crusade to fire this "lazy" black woman started years before she had anything to do with Hyundai. This Court has stated that, when a decision-maker begins efforts towards an adverse action *before* a particular event, the eventual adverse action at issue was likely not motivated by that intervening event. *See Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006); *Bullock v. Kendall*, No. 21-2111, 2022 U.S. App. LEXIS 19981, at *4 (4th Cir. July

38

20, 2022). The same logic applies here. Hosseini's efforts to terminate Wannamaker-Amos long preceded the Hyundai program. Thus, the same inference should apply. Evidence of Hosseini's preexisting motive to terminate Wannamaker-Amos negates any notion that a subsequent intervening event – here, the Hyundai issue — motivated him. That leaves us with just the discriminatory mindset and evidence of pretext. And that is more than enough to survive summary judgment.

Also, any purported failure to respond to Hyundai could not have been a big deal for Purem Novi. The angry January 9 email from Hyundai did not complain about or mention Wannamaker-Amos. Hyundai complained about three failures by three different white males. JA379. Of course, nothing happened to them, even though Purem Novi never showed that it provided Hyundai the promised information. JA202-03 (Response to RTP 32-35); JA132:12 – JA133:7; JA134:1 – JA135:5; JA135:23 – JA136:14.

**D.    The District Court improperly allowed Purem Novi to ignore debunked reasons.**

On top of Hosseini's false reasons in the Supporting Evidences Doc, Purem Novi added other pretextual reasons when Wannamaker-Amos filed an EEOC Charge. In both instances, Purem Novi backed away when Wannamaker-Amos exposed the issues in discovery. For the reasons below, the District Court erred in allowing Purem Novi to do so.

### 1.    Hosseini's original reasons in the Supporting Evidences Doc.

Although Hosseini identified eight reasons to fire Wannamaker-Amos, the District Court homed in on the last one: Whether Wannamaker-Amos failed to respond to Hyundai. Although there are ample reasons to question the failure-to-respond rationale, Purem Novi's abandonment of the other reasons is independent evidence of pretext.

For example, the District Court rejected Wannamaker-Amos's comparison of the Hyundai program to the BMW program based on Purem Novi's latest argument that the Hyundai complaints were not the basis for the termination decision. JA 742 ("[Purem Novi] has not claimed that the plaintiff's employment was terminated based on the number of complaints that Hyundai raised but rather her inaction in response to one of those complaints."). But that is precisely what Hosseini claimed. Hosseini justified termination on the assertion that "[t]he consequences of poor performance has caused several customer complaints . . . and also significant damages to the company." JA43. Of course, Purem Novi wanted to run away from these statements, and the District Court erred in allowing Purem Novi to do so.

Hosseini cited eight reasons, and Purem Novi added on more reasons before the EEOC. When defendants throw everything conceivable against the wall in the hopes that something will stick, rejection of just some reasons will permit the trier of fact to conclude that the remaining reasons were interjected as a pretext as well.

40

*Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 733 (4th Cir. 1996). Likewise, this Court has repeatedly found that an employer's effort to audition reasons and then withdraw them is a quintessential example of pretext. *Gary v. Facebook, Inc.*, 822 F. App'x 175, 183 (4th Cir. 2020); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002); *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217 n.7 (4th Cir. 2007).

Once Wannamaker-Amos provides evidence of pretext, only the jury should decide which side wins. *EEOC v. McLeod Health, Inc.*, 914 F.3d 876, 882 (4th Cir. 2019) (a court's job is not to decide "which party's evidence is stronger or more persuasive"); *Jacobs*, 780 F.3d at 568-69 ("'Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits.'") (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 *569 (3d ed.1998)).

This case turns on Hosseini's state of mind, and only a jury can determine that. *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir. 1987) ("[S]ummary judgment is seldom appropriate in [employment discrimination] cases wherein particular states of mind are decisive as elements of [a] claim or defense." (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)); *Walker v. MCI Telecommunications Corp.*, 1999 WL 503534, *4 (4th Cir. 1999) (quoting *Ballinger*); *accord United States Postal Serv. Bd. of Governors v. Aikens*,

41

460 U.S. 711, 716-17 (1983); *cf. Ray v. Int'l Paper Co.*, 909 F.3d 661, 669 (4th Cir. 2018) (overturning summary judgment by citing *Ballinger*'s state-of-mind rationale in retaliation context when comments and actions by the decision-maker evidenced unlawful intent).

### 2.    Purem Novi's production log assertion.

Purem Novi falsely claimed to the EEOC that Hosseini discovered Wannamaker-Amos's purported errors in "production logs." *See* JA739-40. Even Hosseini refuted Purem Novi's claim that he based his decision on production logs. *Supra* S.O.C. § C(12)(a). Purem Novi abandoned this assertion after its falsity became apparent. *Id.*

To show pretext, a plaintiff need only provide evidence refuting an employer's stated reason. *Reeves*, 530 U.S. at 147; *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 652 (4th Cir. 2021); *Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000). Wannamaker-Amos refuted Purem Novi's claim that Hosseini discovered Wannamaker-Amos's performance deficiencies by reviewing the production logs. That cannot be true, and that is where the summary judgment analysis should end.

### 3.    Purem Novi's claim that Wannamaker-Amos caused it to ship bad parts.

Purem Novi's demonstrable lie that Wannamaker-Amos caused it to ship bad parts also shows pretext. *Supra* S.O.C. § C(12)(b). The District Court, however,

reasoned that Wannamaker-Amos's debunking of Purem Novi's lie was incomplete. The District Court faulted the Undersigned for not asking Purem Novi if the lack of first piece inspection could cause the shipment of bad parts. JA740. There is a good reason the Undersigned did not ask such a question: It could not have anything to do with this case.

Theoretically, an employee's failure to inspect parts could lead to the shipment of bad parts. But that cannot be the case here for several reasons. The only evidence of any issue was a purported isolated and undisclosed issue involving a completely different production line (UCC) in October. JA46. In other words, the late December Hyundai complaint about a product that came off the WCC production line had nothing to do with whatever happened on the UCC production line in early October.

That said, the District Court also failed to credit Wannamaker-Amos's evidence that the first piece inspection process was in place. *Supra* S.O.C. § C(9)(c).[27]

---

[27]     Wannamaker-Amos made this point to the District Court. DE 68 at 16 n.12.

43

**E.    The District Court improperly limited pretext evidence and weighed evidence.**

**1.    Race**

As to Wannamaker-Amos's race claims, the District Court remarked:

> One racially derogatory comment made approximately three years prior to the plaintiff's employment termination, as well as the plaintiff's assertion that she was never instructed to send the response to Hyundai, is simply insufficient to show that the defendant's reasons are pretext for intentional race discrimination.

JA734. Wannamaker-Amos bases her race discrimination claims on much more than this. She also never argued that there was a complete response but that nobody instructed her to send it. There was no response for anyone to send. *Supra* S.O.C. § C(8).

This case also is not based on one derogatory comment. But a jury can consider Hosseini's racist statement about Wannamaker-Amos when holistically analyzing the evidence. *See Guessous*, 828 F.3d at 221. The District Court erred in taking each piece of evidence in isolation, rather than viewing the entire case.

The District Court also erred in stating that Wannamaker-Amos's "assertion that she was never instructed to send the response to Hyundai" was "insufficient." JA734. Although Wannamaker-Amos is not relying solely on her own testimony, the notion that Wannamaker-Amos's testimony counts less than Hosseini's contradicts a core principle of Rule 56. A non-movant's testimony counts *more* than a movant's testimony. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)

44

("[A]t the summary judgment stage, we must view the record in the light most favorable to . . . the non-moving party").

For that reason, a Title VII plaintiff's uncorroborated account is sufficient to create a triable issue of fact. *EEOC v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 331 (4th Cir. 2010); *E.E.O.C. v. Warfield-Rohr Casket Co., Inc.*, 364 F.3d 160, 164 (4th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *Baqir v. Principi*, 434 F.3d 733, 735 n. 1 (4th Cir. 2006) (citing *Warfield-Rohr Casket Co.*); *see also Loveless v. John's Ford, Inc.*, 232 Fed. Appx. 229, 234 n. 8 (4th Cir. 2007) (citing *Warfield-Rohr Casket Co.*).

The District Court summarized its findings, in part, by stating that a plaintiff's own assertions of discrimination cannot show pretext. JA741. This Court recently reversed summary judgment when another court failure to distinguish between mere assertions and the presentation of evidence.

> Sempowich has done more than challenge the criteria or merits of Tactile's evaluations. Sempowich has done what the plaintiff in *Hawkins [v. PepsiCo, Inc.*] failed to do — "supply evidence that [her employer] actually believed her performance was good." This evidence is the employer's own words and actions — the performance ratings, awards, salary raise, and equity grant. Each of these pieces of evidence indicates that Tactile not only thought that Sempowich was performing satisfactorily, but that her performance was of such a high quality that it deserved repeated praise.

*Sempowich*, 19 F.4th at 653 (citing and quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000)); *accord Westmoreland*, 924 F.3d at 728 n.4. Wannamaker-

45

Amos never challenged her termination with a bald assertion that Purem Novi discriminated. Nor did she offer her own *opinion* about her performance to contradict Purem Novi's opinion. Wannamaker-Amos submitted the kind of *facts* that this Court has found to be sufficient for a jury to find pretext.

The District Court also erred by mitigating the effect of Hosseini's racist comments. Hosseini's comments about Wannamaker-Amos and lazy black people show his state of mind.[28] They cannot be dismissed just because they are not timely enough, especially when Hosseini continues to refer to blacks as "colored people" in his deposition. *See Guessous*, 828 F.3d at 221 (summary judgment reversed where history of animus and discriminatory comments raise issues of motive as to termination and pretext); *Anderson v. Ziehm Imaging, GmbH*, No. 7:09-cv-02574-JMC, 2011 U.S. Dist. LEXIS 39874, at *13 (D.S.C. Apr. 12, 2011) (noting that even "stray comments [may] provide circumstantial evidence of discriminatory animus"); *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 301 (4th Cir. 2010) (citing *Lettieri v. Equant, Inc.*, 478 F.3d 640, 649 (4th Cir. 2007) and *Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 608 (4th Cir. 1999)); *Rowland v. Am. Gen. Fin., Inc.*, 340

---

[28]    The other evidence parsed and rejected one-by-one also establishes context and state of mind. Such evidence includes the comparator evidence and Hosseini's dismissive treatment of women, and Wannamaker-Amos in particular.

F.3d 187, 193 (4th Cir. 2003); *see Worldwide Network Servs., LLC v. DynCorp Int'l, LLC*, 365 F. App'x 432, 444 (4th Cir. 2010).

### 2. Sex

As to Wannamaker-Amos's sex discrimination claims, the District Court reasoned:

> [T]he plaintiff's evidence of sex discrimination is unavailing. The undersigned finds that Ms. Shollack's testimony that Mr. Hosseini once blamed the plaintiff for not completing a task when it was a male manager's responsibility and made it a bigger issue if the plaintiff did not do something compared to male employees, as well as the plaintiff's testimony that it was her opinion that Mr. Hosseini favored men over women and that, in meetings with him, she felt like she was supposed to be the note taker, her opinions were not listened to, and she was interrupted, are insufficient for a reasonable jury to conclude that the defendant's stated reasons for terminating her employment were pretext for sex discrimination, particularly when the defendant has provided substantial evidence in support of its reasons. Moreover, Ms. Shollack's testimony that Mr. Hosseini made her and another female fix a male colleague's problems in a report and that she was unsure if any steps were taken after she reported that the male colleague called her and that female "fucking bitches" has little relevance on the issues here.

JA734-35.

The District Court failed to recognize that Hosseini's quest to fire Wannamaker-Amos long predated any issues with Hyundai. *Supra* S.O.C. § C(4). The District Court's reference to Shollack's testimony also misses the point. Wannamaker-Amos never contended that Shollack's testimony relates to the issue of the Hyundai countermeasure. The District Court failed to focus on the actual pretext issues, such as the fact that Purem Novi abandoned Hosseini's rationales,

47

that Hosseini disavowed Purem Novi's argument about the production logs, and the fact that Hosseini lied about the Hyundai response. Those were the pretext arguments Wannamaker-Amos posed, not that Shollack's testimony related to the Hyundai concerns in December 2019.

Shollack's testimony, like the testimony relied on by the *Guessous* Court, shows Hosseini's mindset. The District Court erred by parsing out evidence and analyzing individual pieces in isolation. That approach contradicts the holistic way both courts and juries should view the evidence. *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) ("Th[e] holistic approach is also consistent with the broad remedial purpose of Title VII: to root out the 'cancer [of discrimination] in [the] workplace.'") (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 284 (4th Cir. 2015)). As Judge Childs noted in one of her final district court opinions:

> By nature, circumstantial evidence must be considered as a whole. While individual facts may not be sufficient to cast doubt on an employer's proffered justifications, taken as a whole, the totality of the circumstances surrounding the employer's action may carry the plaintiff's burden in a jury's eyes.

*Edwards v. BCDR, LLC*, Civ. A. No. 3:19-cv-02671-JMC, 2022 U.S. Dist. LEXIS 59900, at *6 (D.S.C. Mar. 31, 2022).

## F.    The District Court erred in claiming that Wannamaker-Amos failed to provide comparator evidence.

The District Court erred further in stating that Wannamaker-Amos provided no information about the BMW comparators. JA 735. Respectfully, that is not the

case. Wannamaker-Amos showed that quality engineers repeatedly failed to resolve complaints from BMW, and that those complaints posed a far greater problem to Purem Novi. *Supra* nn. 4-5 & accompanying text. The District Court suggests that the BMW situations are distinguishable because they do not specifically involve a quality engineer failing to respond to a customer. JA735. But that is the point. Wannamaker-Amos never failed to respond to Hyundai. And Purem Novi knew that when it fired her.

## CONCLUSION

This Court should vacate the judgment entered on behalf of Purem Novi and reverse the District Court's Order granting summary judgment as to the sex and race claims. *See supra* n. 1.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 34(a), Wannamaker-Amos requests that oral argument be held in this matter. The District Court's decision reflects the continued issues litigants experience with how district courts apply this Court's pretext jurisprudence. This case provides an excellent vehicle to affirm and explain the principles in *Cowgill*, *Westmoreland*, and the other cases that explain pretext. Wannamaker-Amos respectfully submits that oral argument may help determine how such principles apply to these facts.

Respectfully submitted this Eleventh day of August 2023.

For the Appellant:

s/ Brian P. Murphy_____
Brian P. Murphy
Stephenson & Murphy, LLC
207 Whitsett Street
Greenville, SC 29601
(864) 370-9400

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**
**Effective 12/01/2016**

No. __23-1568__        **Caption:** __Carmen Wannamaker-Amos v. Purem Novi, Inc.__

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ____10,780____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Brian P. Murphy_____

Party Name __appellant_____

Dated: __8/11/2023_____