# CASE NO. 23-1568

---

# IN THE

# UNITED STATES COURT OF APPEALS

# FOR THE FOURTH CIRCUIT

---

CARMEN WANNAMAKER-AMOS,

*Plaintiff-Appellant*,

– v. –

PUREM NOVI, INC., f/k/a Eberspaecher North America, Inc.,
d/b/a Eberspaecher Group and Purem by Eberspaecher,

*Defendant-Appellee.*

---

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
SOUTH CAROLINA AT GREENVILLE

---

# RESPONSE BRIEF OF APPELLEE PUREM NOVI, INC.

---

MELISSA TETREAU
REBECCA SEGUIN-SKRABUCHA
BODMAN PLC
201 W. Big Beaver, Suite 500, Troy, MI 48084
(248) 743-6000
mtetreau@bodmanlaw.com
rseguin-skrabucha@bodmanlaw.com
*Counsel for Defendant-Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1568__      Caption: __Carmen Wannamaker-Amos v. Purem Novi, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Purem Novi, Inc.__
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      Purem by Eberspaecher; Eberspaecher Group

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

- 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Melissa M. Tetreau                    Date: _____June 9, 2023_____

Counsel for: Appellee

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iiii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ..................................................................2

STATEMENT OF CASE ......................................................................3

    A. Introduction………………………………………………………3

    B. Factual Background…………………………………………………5

SUMMARY OF ARGUMENT ............................................................23

ARGUMENT ....................................................................................23

    A. Standard of Review………………………………...………………..23

    B. Wannamaker-Amos Has No Circumstantial Evidence of
Discrimination………………………………………………...…………25

        1. Wannamaker-Amos Cannot Establish a Prima Facie Case of Race or
Sex Discrimination……………………………………………...…26

        2. Purem's Termination of Wannamaker-Amos for Legitimate, Non-
Discriminatory Business Reasons…………………………...…………28

        3. Wannamaker-Amos Has No Evidence of Pretext…………………31

            i. The District Court's pretext rulings do not conflict with its
prima facie rulings……………………………………………32

            ii. The Cowgill opinion does not support a pretext
finding……………………………………………………...35

            iii. The District Court did not err in finding that Wannamaker-
Amos failed to respond to Hyundai…………………………...38

i

iv. The District Court did not err in dismissing Wannamaker-Amos's false characterizations and hyper-fixation on the EEOC position statement………………………………………………….38

v. The District Court did not err in its review of Wannamaker-Amos's race-based and sex-based allegations……………...…40

vi. The District Court did not err in finding that Wannamaker-Amos failed to provide comparator evidence…………………42

vii. There can be no finding of pretext where Wannamaker-Amos refuses to allege race-based or sex-based discrimination……...44

4. Conclusion………………………………………………...47

STATEMENT REGARDING ORAL ARGUMENT ...........................................47

ii

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Addison v. CMH Homes, Inc.*,
    47 F. Supp. 3d 404 (D.S.C. 2014)..................................................... 27, 28, 37

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................25, 47

*Catawba Indian Tribe v. South Carolina*,
    978 F.2d 1334 (4th Cir. 1992)........................................................ 24

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...................................................................... 24

*Cowgill v. First Data Techs., Inc.*,
    41 F.4th 370 (4th Cir. 2022).......................................................... 35

*DeJarnette v. Corning, Inc.*,
    133 F. 3d 293 (4th Cir. 1998)......................................................... 30

*Diamond v. Colonial Life & Accident Ins. Co.*,
    416 F.3d 310 (4th Cir. 2005).......................................................... 25

*EEOC v. Clay Printing Co.*,
    955 F.2d 936 (4th Cir. 1992).......................................................... 25

*Felty v. Graves-Humphreys Co.*,
    818 F.2d 1126 (4th Cir. 1987)........................................................ 24

*Guessous v. Fairview Prop. Invs., LLC*,
    828 F.3d 208 (4th Cir. 2016).......................................................... 35

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*,
    354 F.3d 277 (4th Cir. 2004)....................................................25, 46

*Holland v. Wash. Homes, Inc.*,
    487 F.3d 208 (4th Cir. 2007).......................................................... 23

iii

*Holmes v. Esper*,
    No. 3:17-cv-00068 ...................................................................45, 46

*Hurst v. District of Columbia*,
    681 Fed. Appx. 186 (4th Cir. 2017) ............................................. 43

*Jones v. Constellation Energy Projects & Servs. Grp., Inc.*,
    629 Fed. Appx. 466 (4th Cir. 2015) ............................................. 25

*Laber v. Harvey*,
    438 F.3d 404 (4th Cir. 2006) ....................................................... 23

*Lightner v. City of Wilmington*,
    545 F.3d 260 (4th Cir. 2008) ....................................................... 42

*Norman v. Call-A-Nurse, LLC*,
    2018 U.S. Dist. LEXIS 204877 (M.D.N.C. Dec 4, 2018) .............. 46

*Love-Lane v. Martin*,
    355 F.3d 766 (4th Cir. 2004) .......................................... 42, 44, 45

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792; 93 S. Ct. 1817; 36 L. Ed. 2d 668 .......................... 25

*Miles v. Dell, Inc.*,
    429 F.3d 480 (4th Cir. 2006) ....................................................... 26

*Mitchell v. Toledo Hosp.*,
    964 F.2d 577 (6th Cir. 1992) ....................................................... 43

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000) ....................................................... 28, 31, 44

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502 (1993) ..................................................................... 32

*Tex. Dept. of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981) ..................................................................... 26

*Thompson v. Potomac Electric Power Co.*,
    312 F.3d 645 (4th Cir. 2002) ....................................................... 26

iv

*Zeuner v. Rare Hospitality Intl., Inc.,*
    338 F. Supp. 2d 626 (M.D.N.C. 2004).............................................................. 31

**STATUTES**

28 U.S.C. § 1331.................................................................................................... 1

28 U.S.C. § 1441(a).............................................................................................. 1

42 U.S.C. § 1981................................................................................................... 25

42 U.S.C. § 2000e-2(a)........................................................................................ 26

**FEDERAL RULES**

Federal Rules of Civil Procedure Rule 56(a)........................................................ 24

# JURISDICTIONAL STATEMENT

Defendant-Appellee Purem Novi, Inc. ("Purem") does not dispute the District Court's subject matter jurisdiction nor this Court's decision to hear this appeal. Purem is satisfied with the Jurisdictional Statement included in the Opening Brief of Plaintiff-Appellant Carmen Wannamaker-Amos ("Wannamaker-Amos"), except that the District Court exercised jurisdiction under 28 U.S.C. § 1331, not 28 U.S.C. § 1441(a). Appellant's Brief, Doc. 13, p. 12.

1

# STATEMENT OF ISSUES

I.      Did the District Court err in dismissing Wannamaker-Amos's claim of race discrimination under Title VII of the Civil Rights Act and Section 1981 where Wannamaker-Amos was not meeting Purem's legitimate expectations, Purem's termination of Wannamaker-Amos's employment was based upon legitimate, non-discriminatory business reasons, and Wannamaker-Amos has no evidence that said reasons were pretext for unlawful discrimination?

The District Court says "No."

Wannamaker-Amos says "Yes."

Purem says "No."

II.      Did the District Court err in dismissing Wannamaker-Amos's claim of sex discrimination under Title VII of the Civil Rights Act where Wannamaker-Amos was not meeting Purem's legitimate expectations, Purem's termination of Wannamaker-Amos's employment was based upon legitimate, non-discriminatory business reasons, and Wannamaker-Amos has no evidence that said reasons were pretext for unlawful discrimination?

The District Court says "No."

Wannamaker-Amos says "Yes."

Purem says "No."

2

## STATEMENT OF CASE

### A. Introduction

Wannamaker-Amos's employment was terminated after months of subpar performance culminated in her complete failure to respond to a critical customer quality issue – a failure that she neither disputes nor disowns. Before the District Court, Wannamaker-Amos attempted to utilize factually unsupported distractions and inflammatory but irrelevant allegations to overcome *her own admission* that she is "not sure" whether Purem discriminated against her on the basis of her race, sex, or age, in violation of Title VII of the Civil Rights Act ("Title VII"), Section 1981, and the Age Discrimination in Employment Act ("ADEA"). The District Court was not fooled and properly granted Purem's motion for summary judgment, finding that: Purem established its "legitimate, nondiscriminatory reason for [Wannamaker-Amos's] termination of employment"; Wannamaker-Amos's supposed evidence of race and sex discrimination "is too attenuated for a reasonable jury to believe that [Purem's] stated reasons are pretext for discrimination, particularly when considering the substantial evidence that [Purem] has set forth in support of its reasons"; and Wannamaker-Amos's "evidence that her employment would not have been terminated but for [Purem's] age discrimination is scant" and reliant upon comparator evidence that crumbles upon the slightest bit of inspection. JA 731, JA 740, JA 742.

Client Documents\4853-6342-9759.v1-9/11/23

On appeal, Wannamaker-Amos's guessing game continues. Throughout years of litigation, Wannamaker-Amos asserted that she was subject to race, sex, and age discrimination, hailing what she proclaimed was mounds of pretext evidence. Suddenly, though, she dismisses her age discrimination claim, necessarily signaling that she considers her allegations of race and sex discrimination to be stronger than her allegation of age discrimination, and confirming that Wannamaker-Amos's appeal hinges on her supposed evidence that specifically references race or sex, not her delineation of fabricated pretext evidence. Wannamaker-Amos's only assertion of race-based evidence is one stray and unrelated remark supposedly made by a decisionmaker more than four years prior to her termination and her disingenuous weaponization of that same decisionmaker's vocabulary as a non-native English speaker. Similarly, Wannamaker-Amos's only assertion of sex-based evidence is another stray and unrelated remark purportedly made years prior by a manager who she does not even name.

Again, this is wholly insufficient. Wannamaker-Amos must, at a minimum, proclaim that she was actually discriminated against in violation of federal law, but she is no more certain that her subjective and amorphous sense of discrimination is derivative of a protected characteristic than an unprotected one. Clearly, Wannamaker-Amos is completely unsure whether any protected classes were implicated, and therefore, whether any violation of law occurred. The District Court

4

concluded that no reasonable juror could believe Wannamaker-Amos's explanation of intentional discrimination – because she has no such explanation. This Court should affirm.

### B. Factual Background

Wannamaker-Amos began working for Purem in 2013 as an APQP (Advanced Product Quality Planning) Engineer. JA 413, JA 421-422. She came to Purem with nearly twelve years of experience in quality engineering. JA 405-412. The Quality Engineer Job Description, which Wannamaker-Amos testified accurately reflected her job duties, makes clear that Wannamaker-Amos was responsible for "reduc[ing] and prevent[ing] defects from reaching [the] customer," "train[ing] associates, engineers and management in core quality tools including the 8 Quality Basics," "audit[ing] plant floor and weld cells for issues and risks of defects," "review[ing] Work Instructions and work[ing] with Manufacturing Engineering to update to include in process inspections, 1st off checks and end of line inspections," among other things. JA 22-25, JA 427. On a day-to-day basis, Wannamaker-Amos was responsible for physically going to the production floor to observe the operation and confirm that equipment gauges and other quality tools were used correctly. JA 424. For instance, if she were to witness a production operator using a quality tool incorrectly, she would speak to the team leader about having the operator re-trained. JA 424. She never documented these conversations.

5

JA 424. Although Wannamaker-Amos remained an APQP Engineer throughout her employment with Purem, the then-Plant Manager Charl Greef added certain supplier quality tasks to her role as well. JA 27-30, JA 430, JA 432.

As reflected in the job description, the Quality Engineers were also responsible for ensuring that Purem's quality basics were implemented and continuously followed. JA 460. Wannamaker-Amos testified that everyone at the Company, including Quality Engineers, had this responsibility.[1] JA 460. The quality basics are eight quality processes: (1) corrective action, (2) containment, (3) red box management, (4) poke yoke, (5) quick problem solving, (6) first-off inspection, (7) rework under control; and (8) self-inspection. JA 447-448. Understanding their importance in preventing defects from reaching the customer, if Wannamaker-Amos saw that quality basics were not being performed by the manufacturing team, she would inform the manufacturing supervisor. JA 458. While everyone at Purem has an obligation to familiarize themselves with the quality basics, it is the Quality Engineer who is responsible for "rais[ing] the flag and correct[ing] them," if they

---

[1] In her Opening Brief, Wannamaker-Amos tries to distance herself from her quality duties by asserting that she "never had responsibility for day-to-day quality assurance activities." Appellant's Brief, Doc. 13, p. 15. Wannamaker-Amos cites her own Declaration in support of this assertion. However, at her deposition, Wannamaker-Amos testified that "everybody at the company," "including quality engineers," had "an obligation to ensure that quality basics [were] being performed." JA 460. Quality assurance was, in fact, key to Wannamaker-Amos's job. Her inability to accurately describe her responsibilities is either purposefully deceptive or confirmation that she was not qualified.

6

are not being implemented or not being implemented correctly. JA 678. In fact, a Quality Engineer has authority to shut down a production line if certain quality basics are not in place. JA 678.

Towards the end of May of 2019, Wannamaker-Amos was assigned as a Quality Engineer on the Hyundai line. JA 32-33, JA 434. The Hyundai program was being moved from Alabama to Purem's Spartanburg, South Carolina facility. JA 435. The Purem Spartanburg plant was going to produce two different exhaust modules: UCC and WCC modules. JA 585.

Wannamaker-Amos was assigned as "the primary point of contact for the plant quality team for this project…." JA 32-33, JA 435. She had "responsibility to ensure that all timing and requirements are met." JA 32-33, JA 436. As a result, she was relieved of all other quality responsibilities to focus entirely on the Hyundai line. JA 32-33. Throughout her time as the quality point person for the Hyundai line, Wannamaker-Amos spoke almost daily with Hyundai. JA 439. She had authority to converse directly with Hyundai personnel without Purem management approval. JA 439, JA 701.

In August of 2019, Purem's Director of Quality, Javad Hosseini, began to travel regularly from the corporate office in Michigan to the Spartanburg facility to assist with issues on the Hyundai lines. JA 592. When at the Spartanburg plant, he spent approximately 70% of his time focused on Hyundai. JA 615. He worked

7

closely with Wannamaker-Amos to ensure that, from a quality perspective, Hyundai was being handled appropriately. JA 592-593.

Around the same time, Wannamaker-Amos conducted an audit of the Hyundai UCC line. JA 467-468. She used a corporate form, which allows the Quality Engineer to evaluate quality-related elements of the line and assign a score of four, six, eight, or ten to each element; a score of ten is the highest score one could achieve. JA 468-469. According to Wannamaker-Amos, a score of ten on any element means that the requirements for that element have been met. JA 495. And yet, during the audit, even on elements which were not applicable, Wannamaker-Amos assessed a score of ten. JA 496. As to containment, Wannamaker-Amos assessed an eight out of ten, despite the fact that red box management, which directly relates to containment, had not yet been set up on the UCC and WCC lines. JA 497. Additionally, Wannamaker-Amos assessed a score of ten for the element that asks whether product-specific requirements could be met with the manufacturing equipment, even though there was no final gauge available to actually test certain product-specific requirements. JA 497-498.

Production of saleable WCC and UCC parts began at Purem in either September or October of 2019. JA 473. With the launch of a new product, containment – one of the quality basics – is triggered. JA 478-479. This means that, at the very latest, safe launch containment should have been in place at the start of

8

production in September or October of 2019. JA 479. Yet, as of November 2019, Wannamaker-Amos had not yet implemented safe launch containment. JA 475.

Another quality basic, first-off inspection, requires that a production employee review and measure the first part produced each day. JA 480. The employee then marks or tags the first part and places it on the first-piece table. JA 480. While Wannamaker-Amos contends that first-off inspection was in process, a photograph taken by Hosseini during production shows an empty first-piece table, meaning production of parts commenced and thereafter continued without a determination that the parts were, in actuality, adequate and compliant pursuant to the requisite inspection process. JA 480-481. Wannamaker-Amos confirms that she and Hosseini walked through the production area at various times, and that Hosseini would bring quality issues to her attention. JA 471. While she does not recall the specific content, she does recall Hosseini making comments about the first-off inspection. JA 471.

Wannamaker-Amos was also required to complete a Hyundai form for special characteristics monitoring, but she is not sure if she ever did. JA 491. She likewise has no recollection as to whether red box management (another quality basic) was implemented on the UCC and WCC lines as of October 2019. JA 493. She does confirm, however, that a photograph taken by Hosseini shows unidentified parts on the production floor, which should not be there. JA 494. If red box management were

9

in place and properly performed, it would prevent such unidentified parts from being strewn about the production floor. JA 494-495. Wannamaker-Amos does recall issues being raised about red box management during her employment. JA 471.

Throughout the summer and fall of 2019, there were multiple quality failures on the Hyundai line. JA 606. As Hosseini continued to look into the issues and get feedback from the customer, he noticed "complete negligence of quality planning stuff that needed to take place in order to give [the] right product to [the] customer."[2] JA 606.

In November of 2019, Hyundai identified an issue with the bar code on the WCC modules. JA 500. As with any quality issue, the quality team's first step was to contain the defect. JA 501. To accomplish containment, the quality team identifies the location of all parts, inspects each part, removes any nonconforming parts and determines the "clean point," or the point at which "everything is accepted," and the defect has been contained. JA 501. The Quality Engineer is the individual

---

[2] In her Opening Brief, Wannamaker-Amos paints herself as a model employee who was held in "high regard" and was "chose[n] . . . to travel to Germany to implement her techniques and strategies abroad." Appellant's Brief, Doc. 13, p. 16. The only support Wannamaker-Amos cites is the testimony of her former coworker, Robin Shollack, who could not identify the third-party auditors who supposedly "complimented" Wannamaker-Amos's performance, whose employment ended in 2017 (approximately three years before Wannamaker-Amos's termination), and who was discharged for lying. JA 67-68, JA 83, JA 94. Furthermore, Wannamaker-Amos explained at her deposition that her trip to Germany was simply part of her APQP engineer position, as opposed to some special recognition of her particular performance. JA 424.

10

responsible for containment. JA 501. As a result, Wannamaker-Amos performed containment for the bar code issue in November of 2019 and summarized the corrective action in Hyundai's form, called a 5 Panel Form. JA 502. When completing 5 Panel Forms for Hyundai, it was required to include the clean point serial number to demonstrate that containment was accomplished. JA 502. Wannamaker-Amos included the clean point serial number on the November 2019 5 Panel Form, establishing that a complete response was implemented for Hyundai's concern. JA 502-504.

Then, on December 19, 2019, Alan Paik at Hyundai emailed Wannamaker-Amos and three others to notify them of a new quality issue. JA 36, JA 504-505. Hyundai had identified a WCC module with a missing pipe. JA 36, JA 504-505. After the email was received, Wannamaker-Amos met with Hosseini that same day to review the issue and discuss Purem's response. JA 505. The first step to address the complaint was for the Quality Engineer to implement containment. JA 505.

That afternoon, at 5:34 p.m., Wannamaker-Amos responded to Hyundai, stating, "As requested, I've attached the 5-Panel." JA 35, JA 40-41, JA 507. The attached 5 Panel Form represents that Wannamaker-Amos oversaw a third party's inspection of 600 WCC modules. JA 40-41, JA 508. Yet, there was no clean point serial number identified as required by Hyundai. JA 509.

After the missing pipe issue was raised by Hyundai, Hosseini considered putting Wannamaker-Amos on a performance improvement plan ("PIP") based on her various quality failings, and he began summarizing support for the PIP. JA 43-51, JA 642. In the supporting document, he listed some of the issues that he had witnessed since his arrival in Spartanburg to assist with the Hyundai launch, including Wannamaker-Amos's failure to: (1) timely implement safe launch inspection; (2) timely implement first-piece inspection; (3) review and update the Process Failure Mode Effects Analysis ("PFMEA"); (4) update the Control Plan; (5) update the Critical Characteristics Monitoring Form; (6) timely implement red box management; (7) accurately document conditions in the Process Audit; and (eventually) (8) promptly respond to Hyundai's quality concerns. JA 43-51. While the PIP document itself was not shared with Wannamaker-Amos, Hosseini had spoken directly with her about many of these issues as they had arisen. JA 471, JA 624-627, JA 649-651, JA 654-655, JA 659, JA 666, JA 675, JA 680, JA 685-686, JA 694.

Then, on January 7, 2022, YongHyun Cho of Hyundai emailed Hosseini, stating: "We had a quality issue on 12/19/19, and no countermeasure received. Have no data to report to HMMA CEO."[3] JA 53. Hosseini included this email in the

---

[3] Wannamaker-Amos claims that she "continued to work with others, including Hosseini, on a countermeasure" during her vacation, and that "Purem Novi falsely claimed . . . that there were no communications between Wannamaker-Amos and

supporting document for his planned PIP. After receiving this email, the team, including Hosseini and Wannamaker-Amos, put together a response for Hyundai. JA 511. However, Wannamaker-Amos – the primary point of contact with Hyundai from a quality perspective – never sent the response. JA 512.

Wannamaker-Amos testified that she did not send the response to Hyundai because it did not meet Hyundai's requirement that it be signed by upper management. JA 512. No such requirement exists. In support of her claim, Wannamaker-Amos relies on an email from Sejong USA (a different customer than Hyundai) that listed requirements for a response to a December 3, 2019 quality issue – one that pre-dated the December 19, 2019 Hyundai missing pipe issue. JA 55-58, JA 514. At her deposition, Wannamaker-Amos confirmed that the signature of the Plant Manager and CEO were requirements of **<u>Sejong</u>** and had nothing to do with the December 19, 2019 **<u>Hyundai</u>** concern. JA 517.

Now, in her Opening Brief, and in reliance upon only her own declaration, Wannamaker-Amos claims that sending the response "was not her job," and that she "never ignored or violated any directive from Hosseini to send a response to Hyundai." Appellant's Brief, Doc. 13, pp. 22-23. However, she definitively testified

---

Hyundai until early January." Appellant's Brief, Doc. 13, p. 22. However, the email communications cited by Wannamaker-Amos prove that Purem's timeline was accurate. After her last email communication to Hyundai on December 19, 2019, there are no email communications from Wannamaker-Amos to Hyundai until January 5, 2020 (i.e., "early January"). JA 182-196.

that, at the end of the day, "meeting requirements is my responsibility," and she admitted that, if Hyundai required a response, which they did, she was the person responsible for providing that response and meeting that requirement. JA 521.

Then, on January 9, 2020, Hyundai found an additional defective part. JA 522. As Wannamaker-Amos put it, "containment had an escape." JA 523. When reviewing the updated 5 Panel Form for the missing pipe issue, completed by Wannamaker-Amos, no clean point was identified. JA 60, JA 522. Clearly, in both procedure and effect, Wannamaker-Amos's containment steps were unsuccessful.

As a result, Hosseini did not implement the PIP and instead recommended moving forward with termination. JA 589. The following day, Wannamaker-Amos's employment was terminated for her failure to respond to Hyundai as required.[4]  JA 523.

Wannamaker-Amos contends that she was terminated "not because of lack of an email, but because the program had issues." JA 527. After her termination, Wannamaker-Amos reported to Human Resources that she was bothered by

---

[4] Purem followed its progressive discipline policy in terminating Wannamaker-Amos's employment. Hosseini determined that, in the month preceding the termination, "things went very wrong," and that any lesser discipline he may have considered previously was no longer sufficient. JA 634. "Gross negligence," or "complete negligence," as Wannamaker-Amos observes, warrants immediate termination under the policy. JA 74; Appellant's Brief, Doc. 13, pp. 34-35. The policy affords for those situations, like here, in which immediate termination is appropriate. JA 73.

14

Hosseini yelling at her in team meetings. JA 528. However, at no time during her employment with Purem did Wannamaker-Amos make any complaints of discrimination or harassment, despite being aware of avenues to report such behavior. JA 416.

During her deposition, Wannamaker-Amos asserts that only Hosseini "discriminated" against her, and that she is "not sure why" or on what basis Hosseini "discriminated" against her. JA 529, JA 540. She also described all of the conduct that she considered to be "discriminatory" in nature:

(1) Hosseini told her that her "team should be performing better" because she "has all these years of experience" (JA 529-530);

(2) On an unknown date and for an unknown reason, Hosseini allegedly told Lou Nespeca, another Purem employee, that she would be terminated (JA 530-531);

(3) She claims that "no one was terminated for having parts be returned from a customer" (Wannamaker-Amos was not terminated "for having parts be returned from a customer") (JA 531-532);

(4) Four Purem employees, who performed various complaint resolution tasks for a different customer, were not terminated for the manner in which they handled that customer's corrective action process, the specifics of which Wannamaker-Amos could not describe, even though Wannamaker-Amos admits that she does not know

15

"why" Hosseini treated them better, nor whether any differential treatment was because they were male or white (JA 533-537, JA 541-542); and

(5) She was asked to attend a software meeting when she was already using the software, but she does not know whether other employees were similarly required to attend such meetings (JA 538).

In a final evolution of her reaction to her discharge, Wannamaker-Amos admits that she is not sure if she was discriminated against because of her race (JA 542) or her sex (JA 543). She is simply and tellingly "not sure why [Hosseini] gave [her] this feeling [she] had a target on [her] back." JA 568.

Now, on appeal, Wannamaker-Amos attempts with distracting and false specificity to pick apart the PIP document, which was never implemented by Purem and was not the basis for her termination of employment:

a.      "The significant damages lie": Wannamaker-Amos claims that Purem committed a "significant damages lie." Appellant's Brief, Doc. 13, pp. 24-25. The draft PIP references "significant damages" that were caused by Wannamaker-Amos's "poor performance and lack of follow through." JA 43. Purem explained that "[d]efective parts and production downtime [have] costs," but that Purem had "not quantified those costs" because "financial damages" were not the "reason for termination." JA 152. Even though the Hyundai program "had issues" because of Wannamaker-Amos's poor performance, and even though Purem suffered damages

16

related to those issues and poor performance, this is not why Wannamaker-Amos was terminated. Again, Wannamaker-Amos was terminated because of her lack of response.

> b.     "Purem Novi did not approve safe launch containment": Wannamaker-Amos attempts to distance herself from her role in ensuring safe launch containment by asserting that Purem "did not care" about safe launch containment, that Hosseini "never discussed any concerns about safe launch containment with [her]," and that he did not "document that there was any purported issue at the time." Appellant's Brief, Doc. 13, p. 26. The PIP's supporting evidence proves Wannamaker-Amos's assertions are untrue and made in bad faith. The draft PIP includes a text exchange between Hosseini and Wannamaker-Amos. On November 1, 2019, Hosseini asked: "Carmen . . . Have we established safe launch?" JA 46. Wannamaker-Amos responded that same day: "Sarah and I to meet Monday 7:30 am. I already created inspection map. She and I will review control plan requirements . . . ." JA 46. Hosseini did not "order" the "establishment of safe launch containment" on November 1, 2019, as alleged in the Opening Brief. Appellant's Brief, Doc. 13, p. 27. He asked Wannamaker-Amos for a status update. Clearly, Hosseini cared about safe launch containment, discussed safe launch containment with Wannamaker-Amos, and the text serves as documentation. Wannamaker-Amos did not respond to

Hosseini and say "not my job"; she responded with a plan for correction, meaning she understood safe launch containment was among her responsibilities.

c.    "First piece inspection was in place": Wannamaker-Amos claims that "Hosseini falsely documented that there was no first-piece inspection in place." Appellant's Brief, Doc. 13, p. 27. At her deposition, though, Wannamaker-Amos admitted that the "part" that "should be on the table" for purposes of the first piece inspection was, in fact, "missing." JA 481. Regardless of how "isolated" the error may have been, Wannamaker-Amos admitted that the error occurred; it is not a falsity. And, Hosseini testified that the team leader informed him that the first piece inspection process had "never been in place." JA 684.

d.    "WCC PFMEA not reviewed or updated": Wannamaker-Amos outright mischaracterizes Hosseini's testimony in suggesting that the PFMEA was irrelevant to her performance. Appellant's Brief, Doc. 13, pp. 28-30. At his deposition, Hosseini explained that the manufacturing engineer on the line creates the PFMEA, and then the quality team utilizes the PFMEA to create the control plan; the two processes are inherently linked because the PFMEA predicts potential failures, and the control plan outlines how to respond to each potential failure. JA 661-663. Hosseini asked Wannamaker-Amos about the status of the PFMEA because, without a PFMEA update, she cannot update her control plan. JA 47. When Wannamaker-Amos confirmed that she had not participated in any PFMEA updates, he knew that

18

her control plan was correspondingly delinquent. JA 47. Hosseini described his

frustration:

> I go on-line and I can see those documents myself. I looked June 17 and today is November. It's . . . five months for a line that is very fluid. This install certainly has been a lot of changes. I was looking that why update has not happened . . . [T]he question is, you need to update your control plan. You need to update [PFMEA] why the flag is not raised, why action is not taking place.

JA 665. Hosseini's concern is not that the PFMEA was created in May or June. His

concern was that it was November, and the PFMEA had never been updated,

meaning, consequently, Wannamaker-Amos's control plan had never been updated.

e.     "Control plan not updated": Wannamaker-Amos does not and cannot

deny that she did not update the control plan after the PFMEA was edited, nor that

the control plan that she did create back in May was "incomplete" and "not

validated." Appellant's Brief, Doc. 13, pp. 30-31; JA 47-48.

f.     "Critical characteristics monitoring form": Hosseini testified that the

form demonstrated that: "[n]o measurement, no check was done in three phase[s] of

[the] program as is described and this needed to be done"; the measurements were

not done "[b]ecause [Wannamaker-Amos, his] quality engineer[,] did not follow up

to do them"; and Wannamaker-Amos could not blame the absence of an automated

gauge for her complete failure to perform any of the measurements. JA 672-674.

Hosseini substantiated the critique included in the draft PIP – he knew it was true

both when he compiled the draft PIP and when he testified at his deposition.

g.      "Red box management not in place": Wannamaker-Amos pretends that her only shortcoming with regard to red box management is that she was using an orange crate. Appellant's Brief, Doc. 13, pp. 31-32. Hosseini explained that the photograph contained within the draft PIP proves not just that there was an error on that day, but that Wannamaker-Amos failed to implement the management system altogether:

> There was no red box, at all, around the unit production area. Red box process not implemented. And many non-conforming parts were around the production area without proper tag on them. All those needs to be part of process . . . Floor marking was not in place . . . If you paint the floor, . . . the floor painting should stay. That's what I look at [as] evidence.

JA 678-679. Furthermore, and contrary to her assertion in her Opening Brief, Hosseini did raise the issue with Wannamaker-Amos:

> I walk with [Wannamaker-Amos] to the line. I showed her [every single item] and she kept note . . . [Purem] has a process; walk the line. I walk the line with her. They call it . . . go out and see []. That's what they say, and I did that with [Wannamaker-Amos].

Appellant's Brief, Doc. 13, p. 32; JA 680. Wannamaker-Amos *admitted* that Hosseini walked the line with her and identified issues related to Hyundai. JA 471.

h.      "Process audit not reflecting reality": Wannamaker-Amos again tries to downplay her own errors by claiming that Hosseini's criticism of her audit "focused . . . on the lack of an automated gauge." Appellant's Brief, Doc. 13, p. 33. In actuality, as Hosseini described in great detail, the issue with the audit is that it did

20

not "make sense." JA 694. For example, low scores should have been accompanied by an action plan, but they were not. JA 694. The reference to the gauge was merely an "example" because different gauges would have required different processes, none of which was outlined in the audit – whether "there was a gauge or [no] gauge" was "irrelevant" because "we are talking about [how] the process was not followed." JA 688-690.

i.      "Wannamaker-Amos did not respond to Hyundai on time": Wannamaker-Amos asserts that Hosseini, not Wannamaker-Amos, "was directing the response." Appellant's Brief, Doc. 13, p. 34. However, Wannamaker-Amos testified that it was *her* responsibility to respond to Hyundai. JA 521.

Purem addresses the above for this Court's convenience and complete understanding. Nonetheless, issues (a) through (h) are not material, and any inconsistencies in the parties' portrayal thereof does not create a genuine issue of *material* fact. The material facts surrounding Wannamaker-Amos's termination are quite simple and remain undisputed:

- Wannamaker-Amos was assigned as "the primary point of contact for the plant quality team for this [Hyundai] project…." and she had "responsibility to ensure that all timing and requirements are met" (JA 32-33, JA 435-436);

21

- Wannamaker-Amos received a December 19, 2019 Hyundai complaint regarding a WCC module with a missing pipe (JA 35-36, JA 504-505);

- Wannamaker-Amos and Hosseini met on December 19, 2019 to discuss Purem's response (JA 505);

- Wannamaker-Amos's December 19, 2019 response did not contain a clean point serial number (JA 509);

- After YongHyun Cho of Hyundai emailed on January 7, 2020, Hosseini and Wannamaker-Amos worked together to draft a response (JA 511);

- No response was sent on January 7, 2020 (JA 512);

- Wannamaker-Amos admits that, if Hyundai required a response, which they did, she was the person responsible for providing that response and meeting that requirement (JA 521); and

- On January 8, 2020, YongHyun Cho called Hosseini, extremely angry that no response was sent (JA 573).

Wannamaker-Amos is not being faulted for failing to provide the clean point serial number on December 19, 2019, but instead, for her failure to ever provide it. Even Wannamaker-Amos's own exhibit, the updated 5-Panel form sent late on January 8, 2020, does not contain a clean point serial number. JA 196.

# SUMMARY OF ARGUMENT

Wannamaker-Amos demonstrated that she was not qualified for her APQP Engineer position by subverting or altogether ignoring Purem's quality systems over a period of several months, all of which preceded Purem's termination of her employment for one legitimate, non-discriminatory reason: Wannamaker-Amos infuriated a valuable customer when she failed to provide a requisite quality response. The District Court granted Purem's motion for summary judgment because the District Court did not fall for Wannamaker-Amos's messy, deceptive, and faulty attempt to create evidence of pretext. This Court must affirm the grant of summary judgment and similarly reject Wannamaker-Amos's exaggerated delineation of "evidence" that does not support a pretext finding, especially where Wannamaker-Amos herself is "not sure" that she was actually subject to discrimination proscribed by federal law.

# ARGUMENT

### A. Standard of Review

This Court reviews "de novo the district court's grant of summary judgment . . . applying the same standard as did the district court." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007), citing *Laber v. Harvey*, 438 F.3d 404, 415 (4th Cir. 2006) (en banc).

23

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (finding that judges have an "affirmative obligation" to prevent "factually unsupported claims" from going to trial). When this burden is met, the nonmoving party must make a "sufficient" showing to establish the existence of each essential element of that party's case, and "on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23; *Catawba Indian Tribe v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992) (recognizing that the "non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts," and that "summary judgment is appropriate" where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party") (internal citations omitted).

The nonmoving party must "go beyond the pleadings" and "designate" from the evidence "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff." *EEOC v. Clay Printing Co.*, 955 F.2d 936, 943 (4th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

**B.  Wannamaker-Amos Has No Circumstantial Evidence of Discrimination**

"A plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact . . . ." *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005); *see also Jones v. Constellation Energy Projects & Servs. Grp., Inc.*, 629 Fed. Appx. 466, 468 (4th Cir. 2015) ("A plaintiff may prove discrimination under Title VII [or] 42 U.S.C. § 1981 . . . 'either through direct and indirect evidence of [discriminatory] animus, or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 . . . (1973)'").

Because Wannamaker-Amos has no direct evidence of discrimination, she must proceed through *McDonnell Douglas*'s burden-shifting framework.[5] *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 285 (4th Cir. 2004). "First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima

---

[5] Wannamaker-Amos acknowledges the lack of direct evidence by implementing the *McDonnell Douglas* burden-shifting framework in her Opening Brief. Appellant's Brief, Doc. 13, p. 39.

facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' . . . Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981).

## 1. Wannamaker-Amos Cannot Establish a Prima Facie Case of Race or Sex Discrimination.

Title VII prohibits an employer from "discharg[ing] any individual, or otherwise . . . [discriminating] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C.A. § 2000e-2(a). To prove a prima facie case of discrimination under Title VII[6] in the absence of direct evidence, Wannamaker-Amos must demonstrate: (1) membership in a protected class; (2) termination of employment; (3) she was performing at a level that met Purem's legitimate expectations at the time of termination; and (4) her position remained open or was filled by a similarly qualified individual outside the protected class. *Miles v. Dell, Inc.,* 429 F.3d 480, 485 (4th Cir. 2006).

---

[6] Wannamaker-Amos alleges race discrimination under both Title VII and Section 1981. The Court should consider these claims "together" because "the elements required to establish a prima facie case are the same under Title VII and Section 1981." *Thompson v. Potomac Electric Power Co.*, 312 F.3d 645, n.1 (4th Cir. 2002).

26

Wannamaker-Amos cannot establish the third element of a prima facie case because she was not satisfactorily performing her job duties with regard to the Hyundai program. "In analyzing this element to determine satisfactory job performance, a plaintiff's performance is evaluated at the time of the alleged adverse action and courts have recognized that it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Addison v. CMH Homes, Inc.*, 47 F. Supp. 3d 404, 420 (D.S.C. 2014). Clearly, in the months leading up to Wannamaker-Amos's termination, she was not meeting Purem's legitimate expectations. As Hosseini stated, Wannamaker-Amos's failure to ensure that even the simplest quality basics were in place demonstrated "complete negligence." JA 606. Months after production had begun, Wannamaker-Amos still had not implemented safe launch containment as required. JA 475. When unidentified parts were found on the production floor, Wannamaker-Amos failed to raise a red flag, even though she recognized that those parts should not be there. JA 493-494. Then, when Hyundai reported a serious quality issue in December of 2019, Wannamaker-Amos's response failed to identify a clean point serial number as required by Hyundai. JA 509. And these are merely the issues with which Wannamaker-Amos agrees! As demonstrated in Hosseini's supporting document for creation of a PIP, there were other serious and egregious shortcomings in Wannamaker-Amos's

performance, and she was not fulfilling her obligation to safeguard quality for the Hyundai modules. JA 43-51.

While all Purem employees are expected to have a working knowledge of the quality basics, understanding and implementing those quality basics is integral to the Quality Engineer position. JA 22-25, JA 598-599. Of course, then, it is legitimate for Purem to expect that its lead Quality Engineer in charge of the Hyundai program at Spartanburg would ensure, at a minimum, that quality basics were being performed. "As long as the requirements imposed are bona fide expectations, it is not the court's province to determine whether an employer demands too much of its workers." *Addison*, 47 F.Supp.3d at 420. The record clearly reflects that Wannamaker-Amos's job performance was not meeting Purem's legitimate expectations at the time of her termination. As a result, Wannamaker-Amos is unable to establish a prima facie claim of race or sex discrimination under Title VII or Section 1981, and affirmation of summary judgment is appropriate.

### 2. Purem's Termination of Wannamaker-Amos for Legitimate, Non-Discriminatory Business Reasons

Notwithstanding Wannamaker-Amos's failure to establish a prima facie case of race and/or sex discrimination, Purem has produced evidence that Wannamaker-Amos was terminated for legitimate, nondiscriminatory reasons. Purem's burden "is one of production, not persuasion; it can involve no credibility assessment." *Reeves*

*v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (internal quotation omitted).

Wannamaker-Amos's unjustified failure to respond to Hyundai's January 7, 2020 email undoubtedly constitutes a legitimate, non-discriminatory business reason for her termination. Hyundai needed and was entitled to a countermeasure response to its December 19, 2019 quality concern, which Wannamaker-Amos confirmed was her responsibility to provide. JA 521. Yet, she completely failed to do so. When confronted with her failure, her only excuse was to state, with no factual or evidentiary support whatsoever, that the Hyundai form required upper management approval. JA 512. Wannamaker-Amos's attempted misdirection, whether intentional or not, cannot rewrite the facts, nor can it downplay the gravity of her unsatisfactory performance.

First, Wannamaker-Amos herself testified that Hyundai uses a 5 Panel Form for countermeasure responses, which she eventually admitted does not require upper management approval, and which she ultimately sent to Hyundai without upper management's signature. JA 60, JA 502, JA 518, JA 522. She also acknowledged that her testimony as to the requirement of upper management approval was incorrectly based on an email from a different customer, Sejong, regarding a different complaint altogether. JA 517. Regardless, even if Hyundai's form required upper management approval (which it did not), Wannamaker-Amos again confirmed

29

that Hyundai required a response, it was her responsibility to provide that response, and she failed to do so. JA 521.

Second, Wannamaker-Amos attempts to portray her termination as one "lack of an email" among a program that "had issues." JA 527. The "lack of an email" served as the figurative last straw. After months of refusing to adequately implement, monitor, and update the requisite quality procedures, Wannamaker-Amos replies to the December 19, 2019 Hyundai complaint with an incomplete 5 Panel Form that does not identify a clean point serial number, as is necessary, and the containment she supposedly conducted had "an escape" that facilitated the delivery of yet another defective part to Hyundai. JA 507-508, JA 523. If such utter failures were not enough, Wannamaker-Amos then chose not to send a response email to an already frustrated customer (a response email that Hosseini generously assisted in drafting). JA 511-512. Evidently, Wannamaker-Amos could not perform quality basics and failed to contain defective parts – the very foundation of her position – and she could not even be bothered to send an email communication drafted for her, all of which legitimately and understandably culminated in her January 10, 2020 termination.

At the time of her termination, it was made clear to Wannamaker-Amos that the decision had been made based on her failure to respond to Hyundai's concerns. JA 523, JA 527. In the end, it is not the role of this Court to second-guess Purem's decision. *DeJarnette v. Corning, Inc.*, 133 F. 3d 293, 299 (4th Cir. 1998) (internal

citations omitted) (explaining that courts do not "sit as a kind of super-personnel department weighing the prudence of employment decisions."). Purem's reason for terminating Wannamaker-Amos's employment was truly and justifiably based on legitimate, non-discriminatory reasons. Purem has met its burden of production, and any "presumption of discrimination drops out of the picture." *Zeuner v. Rare Hospitality Intl., Inc*., 338 F. Supp. 2d 626, 636 (M.D.N.C. 2004) (internal quotations omitted). For her claims to survive, Wannamaker-Amos must establish pretext, which she cannot do.

### 3. Wannamaker-Amos Has No Evidence of Pretext

Once Purem explains its legitimate, non-discriminatory reason for termination, as it has successfully done, the burden returns to Wannamaker-Amos, who is afforded "the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (internal quotations and citations omitted). "That is, the plaintiff may attempt to establish that [she] was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." *Id*. Wannamaker-Amos has not provided any evidence to demonstrate that Purem's reason for her termination is false, nor has she established that discrimination, whether based on race and/or sex, serves as the real reason for her termination. *See*

31

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (holding that plaintiff must show "both that the [defendant's] reason was false, and that discrimination was the real reason").

The District Court agreed, finding that Wannamaker-Amos "failed to show that a reasonable jury could believe [her] explanation of intentional race or sex discrimination," dismissing as unpersuasive Wannamaker-Amos's purported pretext evidence, including the alleged derogatory comments and comparators. JA 734-741.

Here, Purem addresses Wannamaker-Amos's renewed, but once again unsuccessful, attempt to prove pretext:

### i. The District Court's pretext rulings do not conflict with its prima facie rulings.

Wannamaker-Amos incorrectly claims that the "District Court's decision contains an irreconcilable conflict that precludes judgment as a matter of law." Appellant's Brief, Doc. 13, p. 39. Wannamaker-Amos appears to fundamentally misunderstand Purem's argument and the District Court's holding.

Wannamaker-Amos suggests that, in challenging "Wannamaker-Amos's ability to establish a prima facie case," Purem "relied on Wannamaker-Amos's purported failure to 'respond to Hyundai's email regarding a lack of responsiveness on the missing pipe issue after Mr. Hosseini instructed her to do so." Appellant's Brief, Doc. 13, pp. 39-40. This is inaccurate. The District Court correctly observed that, in actuality, Purem "set forth numerous issues it had with [Wannamaker-

32

Amos's] performance" in its argument that she "was not meeting its legitimate expectations at the time of her employment termination," including:

> [H]er failure to provide accurate scoring on an internal audit; implement safe launch containment by the start of production; ensure that first-off inspection was taking place on October 1, 2019; complete a Hyundai form for special characteristics monitoring; properly implement red box management; properly implement containment or provide a clean point serial number regarding the missing pipe; and respond to Hyundai's email regarding a lack of responsiveness on the missing pipe issue after Mr. Hosseini instructed her to do so.

JA 728-729. Purem argued that, when *all* of the evidence of poor performance is considered together, Wannamaker-Amos is unable to establish even a prima facie case because her effectuation of her job duties was so delinquent that she was, in general, not meeting the legitimate and basic expectations of her position. JA 728-729.

Wannamaker-Amos then egregiously and deceptively mischaracterizes the District Court's prima facie analysis. The District Court did not find that Wannamaker-Amos "contradicted [Purem's] assertion that she did not respond to Hyundai's concerns," nor that she "could not provide a clean point serial number regarding the missing pipe up to the time of her employment termination because she did not have the information she needed yet from Alabama," nor that "she was never instructed to send the response to Hyundai's email." Appellant's Brief, Doc. 13, pp. 39-40. The District Court gave no credence to Wannamaker-Amos's excuses.

It merely summarized Wannamaker-Amos's "explanations" for Purem's many examples of poor performance. JA 729.

Critically, the District Court did *not* find "that disputed issues of material fact exist as to [Purem's] assertion that Wannamaker-Amos did not respond to Hyundai." Appellant's Brief, Doc. 13, p. 40. The District Court *only* found that "genuine issues of material fact remain" as to whether the collective evidence of poor performance proves that Wannamaker-Amos was "meeting [Purem's] legitimate expectations." JA 730.

On appeal, Wannamaker-Amos suggests that her own misreading of the District Court's holding requires its reversal. Wannamaker-Amos claims that "the District Court's prima facie conclusion that Wannamaker-Amos created disputed issues of material fact should have been dispositive." Appellant's Brief, Doc. 13, p. 40. This argument undermines the *McDonnell Douglas* framework – a plaintiff does not rebut summary judgment by simply proving a prima facie case. And, the District Court did not do "an about face and [abandon] its prima facie case findings about the response to Hyundai." Appellant's Brief, Doc. 13, p. 40. The District Court only concluded that Purem's collective evidence of poor performance did not prove Wannamaker-Amos's overall failure to meet expectations – not that any of Purem's evidence was false, and certainly not that Wannamaker-Amos's failure to respond to the customer was not the legitimate business reason that actually and truly

34

motivated Wannamaker-Amos's termination. Wannamaker-Amos tries to conflate two different *McDonnell Douglas* inquiries. A determination that an employee was meeting expectations does not preclude a determination that the same employee was legitimately terminated.[7] To do so would collapse the burden-shifting nature of *McDonnell Douglas* and necessitate a denial of summary judgment every time a plaintiff establishes a prima facie case. Of course, this utter rejection of the framework through which discrimination claims are evaluated is Wannamaker-Amos's error, not the District Court's.

### ii. The *Cowgill* opinion does not support a pretext finding.

In citing *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 383 (4th Cir. 2022), Wannamaker-Amos claims that pretext can be found because Purem (1) deviated from normal procedures, (2) cited issues arising the prior month, and (3) failed to provide coaching on performance issues. Appellant's Brief, Doc. 13, p. 42. None of these are accurate. First, Hosseini testified that he treated Wannamaker-Amos like every employee he had encountered throughout his career at Purem: "[I]n 17 years of my work in [Purem] . . . I . . . sit with [employees] and do not bring a paper document at the end . . . [In] a manufacturing environment . . . [t]hat's how

---

[7] In support of her argument, Wannamaker-Amos cites *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 220 (4th Cir. 2016). There, the Fourth Circuit found that the district court's analysis was "internally inconsistent." *Id*. No such inconsistency exists here.

discussion take[s] place." JA 686. Never in his 17 years at Purem did Hosseini provide an employee with a written warning under the Performance Improvement Policy. JA 686. Further, Hosseini promptly took action towards termination after discovering Wannamaker-Amos's failure to satisfy Hyundai's response requirements. And, finally, Wannamaker-Amos herself testified that Hosseini assisted her in creating the response to Hyundai on December 19, 2019 and January 7, 2020. JA 511.

There is no evidence whatsoever that Hosseini was attempting to "secretly" build a case against Wannamaker-Amos. He spoke with her throughout his time at the Spartanburg plant in an attempt to help her improve her performance. JA 471, JA624-627, JA 649-651, JA 654-655, JA 659, JA 666, JA 675, JA 680, JA 685-686, JA 694. He sat with her on December 19 and January 7 to assist her responding to Hyundai. Wannamaker-Amos is solely at fault for her own termination – she was unwilling or unable to improve.

Furthermore, this is not a situation in which the plaintiff committed "one *infraction* that did not require termination" and constituted "an extreme overreaction." Appellant's Brief, Doc. 13, p. 42 (citations omitted). After months of poor performance and inadequate quality responses, Wannamaker-Amos failed to send a response to an already-angry customer – a response that Hosseini helped her draft, and that she admitted was her responsibility to complete. Wannamaker-Amos

36

cannot minimize her grave error as a silly little infraction. It jeopardized a key customer relationship, undoubtedly warranting termination. Additionally, "courts have generally recognized that an employer's unfair deviation from its own termination procedures or its failure to adhere to common notions of fairness in the termination process is not probative of discriminatory intent and cannot show pretext." *Addison v. CMH Homes*, 47 F.Supp.3d 404, 422 (D.S.C. 2014).

Wannamaker-Amos also claims that the District Court "got backwards" the comparator "rationale," but its quote of the District Court's opinion is incomplete. Appellant's Brief, Doc. 13, p. 45. The District Court's full finding reads as follows: "[T]here is no evidence that Mr. Hosseini treated the plaintiff any differently than other employees who were terminated from employment *or that he deviated from his usual method of discipline*." JA 737 (emphasis added). Yes, the "issue is whether employees outside the protected classes were treated better than the plaintiff." Appellant's Brief, Doc. 13, p. 45. Inherent to such an analysis would be whether Hosseini "deviated from his usual method of discipline" when terminating Wannamaker-Amos. The District Court correctly found no deviation. As fully discussed below, Wannamaker-Amos's assertion that "The Record . . . reflects far worse quality problems with programs run by white employees" as comparator evidence misses the critical point that she was not terminated for generalized "quality problems" with the Hyundai program. Appellant's Brief, Doc. 13, p. 46.

37

### iii.  The District Court did not err in finding that Wannamaker-Amos failed to respond to Hyundai.

Wannamaker-Amos attempts to absolve herself of any wrongdoing by claiming, without support, that "Hosseini assumed responsibility for communicating with Hyundai." Appellant's Brief, Doc. 13, p. 47. But, there is no dispute that it was Wannamaker-Amos who ultimately failed to respond to Hyundai on January 7, 2020. Her late attempt to deflect blame is not persuasive, as she clearly testified that, at the end of the day, "meeting requirements is my responsibility." JA 521. She admitted that, if Hyundai required a response, which they did, she was the person responsible for providing that response and meeting that requirement. JA 521. It was Wannamaker-Amos's job to investigate the customer complaint – an investigation she failed to complete and, as a result, was unable to provide the necessary countermeasure to the customer. There is no "inherent inconsistency." Appellant's Brief, Doc. 13, p. 47. In addition, Wannamaker-Amos cites no evidence for her contention that Hosseini possessed some "preexisting motive to terminate [her]." Appellant's Brief, Doc. 13, p. 50.

It is, therefore, undisputed that Wannamaker-Amos actually engaged in the conduct for which she was terminated, and that said conduct warranted termination.

### iv.  The District Court did not err in dismissing Wannamaker-Amos's false characterizations and hyper-fixation on the EEOC position statement.

38

First, Wannamaker-Amos alleges that Purem "abandoned" seven of the eight reasons identified by Hosseini "to fire Wannamaker-Amos," and that said "abandonment . . . is independent evidence of pretext." Appellant's Brief, Doc. 13, p. 51. All eight reasons outlined in the draft PIP are factually accurate and maintained by Purem. As Purem has consistently explained throughout the entirety of this litigation, it is the eighth reason (i.e., Wannamaker-Amos's failure to send the response) that pushed Hosseini to elevate Purem's disciplinary response from implementation of the PIP to termination of employment. JA 589.

Second, Wannamaker-Amos claims that Purem "falsely" represented to the EEOC "that Hosseini discovered Wannamaker-Amos's purported errors in 'production logs'," and that Hosseini "refuted" this claim. Appellant's Brief, Doc. 13, p. 53. A label applied to evidence at the EEOC stage is not suggestive of pretext. Hosseini testified that, in reviewing Wannamaker-Amos's performance, he looked at "data" – "what we have produced, what was faulty, what was good production, what days we created those." JA 635-636. Hosseini confirmed that the "production log" that was presented to him as an exhibit during his deposition was "part of data that [he had] used in [his] investigation." JA 636.

Third, Wannamaker-Amos describes the shipment of bad parts mentioned in the EEOC position statement as a "demonstrable lie." Appellant's Brief, Doc. 13, p. 53. However, Wannamaker-Amos has no proof that bad parts were not shipped, nor

that any such shipment was not the result of her own failure to implement quality systems. Wannamaker-Amos only cites to the draft PIP. Appellant's Brief, Doc. 13, p. 54. Exclusion from the draft PIP is not evidence that bad parts were not shipped, and, as noted by the District Court, "[Purem] does not claim in the position statement that it terminated [Wannamaker-Amos's] employment based on these issues," making them irrelevant. JA 740.

> **v.  The District Court did not err in its review of Wannamaker-Amos's race-based and sex-based allegations.**

With regard to the legitimate reason for termination, Wannamaker-Amos claims that the District Court gave more weight to Hosseini's testimony than her own testimony in finding that she failed to send the requisite response to Hyundai. Appellant's Brief, Doc. 13, pp. 55-56. However, the District Court specifically relied on Wannamaker-Amos's own testimony: "[Wannamaker-Amos] testified in her deposition that she was the primary point of contact for the Hyundai line, meeting requirements was her responsibility, and that if a customer was saying 'I need a response,' providing that response and meeting that requirement was her responsibility." JA 731.

With no actual evidence, Wannamaker-Amos next assumes that Hosseini acted upon race-based animus. Appellant's Brief, Doc. 13, p. 57. But, Hosseini has no professed racism. Wannamaker-Amos's attempts to weaponize the inarticulate remarks of a non-native English speaker should be entirely disregarded. First,

Hosseini identifies as a person of color. JA 572. His statement about "colored people" was only to distinguish between white individuals, Black individuals and other people of color. "I had two colored people work as quality engineer….And that's if you're asking about non-white people, those were working for me at Wixom." JA 619. It was not stated in a derogatory or discriminatory way. Hosseini even informed Wannamaker-Amos during his deposition that "English is my second language." JA 678. The personal attacks and attempts to portray Hosseini as racist based almost entirely on his failure to master the English language and walk the tightrope that is American English political correctness under the pressures of a deposition are discriminatory and shameful. Next, an alleged comment more than four years prior to Wannamaker-Amos's termination that Black employees are "lazy" is not indicative of discriminatory intent. Hosseini did not make "stray" discriminatory statements – he allegedly stated one time (*more than four years prior to the termination*) that Black individuals were lazy and then – *more than four years later* – terminated a Black employee, but not for laziness. Again, this is not evidence of pretext.

In the sub-section of her Opening Brief entitled "Sex," Wannamaker-Amos quotes the District Court's analysis, finding her "evidence of sex discrimination . . . unavailing," but she does not otherwise identify a single piece of evidence of sex-based animus. Appellant's Brief, Doc. 13, pp. 58-59.

### vi. The District Court did not err in finding that Wannamaker-Amos failed to provide comparator evidence.

Wannamaker-Amos argues that she was treated differently than similarly-situated employees on the BMW line, which had a higher volume of complaints.[8] Appellant's Brief, Doc. 13, p. 20. She claims that the District Court "erred . . . in stating that Wannamaker-Amos provided no information about the BMW comparators," and in finding "that the BMW situations are distinguishable because they do not specifically involve a quality engineer failing to respond to a customer." Appellant's Brief, Doc. 13, pp. 59-60. Wannamaker-Amos's assertion of error fails. To be meaningful, "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established…." *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004) (quoting *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008)). Wannamaker-Amos claims that four Quality Engineers on the BMW line were not terminated for quality complaints. JA 533. But, as the District Court determined, she cannot show that these individuals were similarly situated. A showing that individuals are similarly situated typically includes

---

[8] Wannamaker-Amos also tries to draw significance from a "spike" in complaints on the Hyundai line in the year after her termination. Appellant's Brief, Doc. 13, p. 36. This is immaterial. Wannamaker-Amos was never criticized and certainly was not terminated for the number of complaints incurred. She was criticized for a refusal to properly implement quality systems, and she was terminated for a failure to respond to a particular customer concern. The "spike" could be explained by any number of unrelated factors (e.g., the commencement of a global pandemic).

Client Documents\4853-6342-9759.v1-9/11/23

evidence that employees "dealt with the same supervisor, . . . [were] subject to the same standards[,] and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct." *Hurst v. District of Columbia*, 681 Fed. Appx. 186, 191 (4th Cir. 2017) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Here, Wannamaker-Amos does not know how each complaint was handled, how the complaints were investigated, how the complaints were resolved, or even if the employees were disciplined as a result. JA 533-537. She does not even know if Hosseini would have been the individual responsible for disciplining the BMW Quality Engineers for these complaints. JA 539-540. As a result, there is no evidence that the BMW Quality Engineers were similarly-situated to Wannamaker-Amos.

And, even if they were similarly-situated (which they are not), Wannamaker-Amos cannot demonstrate that she was treated differently. Her claim is that these Quality Engineers were not terminated "for having parts be returned from a customer." JA 532. Neither was she. As established, Wannamaker-Amos was terminated for her failure to respond to Hyundai's December 19, 2019 quality concern. On appeal, Wannamaker-Amos ignores the record evidence to make her only remaining argument, suggesting that she "never failed to respond to Hyundai," and that the comparison should focus on whether the BMW Quality Engineers "repeatedly failed to resolve complaints," and whether those "complaints posed a far

43

greater problem to [Purem]." Appellant's Brief, Doc. 13, p. 60. Wannamaker-Amos cannot rewrite the reason for her termination, nor can she ignore her own admissions about her termination, in order to manipulate data. Regardless, the fact that the BMW line experienced more complaints does not mean that the BMW Quality Engineers failed to resolve those complaints, nor that those complaints were problematic for Purem. None of Wannamaker-Amos's twists and turns through BMW data creates comparator evidence or evidence of pretext.

> ### vii. There can be no finding of pretext where Wannamaker-Amos refuses to allege race-based or sex-based discrimination.

Simply put, Wannamaker-Amos cannot establish pretext. "The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.' . . . It is not enough . . . to disbelieve [the employer]; the factfinder must believe [the plaintiff's] explanation of intentional [] discrimination.'" *Love-Lane v. Martin*, 355 F.3d 766, 788 (4th Cir. 2004), quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-147 (2000). No reasonable juror could believe Wannamaker-Amos's explanation of intentional discrimination – **because even she does not believe there was intentional discrimination**. When asked, "do you feel Javad [Hosseini] discriminated against you because of your race?," Wannamaker-Amos responded,

"I just feel discriminated against." JA 540. She was then asked, "Do you feel discriminated against based on anything in particular?" and she responded, "I'm not sure why." JA 540.

In fact, to be even more clear, Wannamaker-Amos was asked, "you said you felt like you had a target on your back, but you aren't sure if it's due to your race, right?" She responded, "I'm not sure why – I'm not sure why he gave me this feeling I had a target on my back." JA 568. When asked if she thought it was due to being a female, she again responded that **she was not sure**. JA 568.

Mere "unsupported opinions" of discriminatory intent cannot establish pretext. *Love-Lane*, 355 F.3d at 788-89. In *Love-Lane*, the plaintiff suggested that her employer's justification for its adverse employment action "may be false," but the court was unconvinced because her only evidence of pretext was her own "unsupported opinion" of "improper discriminatory intent." *Id*. Here, Wannamaker-Amos does not even allege a discriminatory intent. Instead, she admits that she was unsure as to whether the figurative and self-perceived "target on [her] back" was due to her race or sex. JA 568.

Wannamaker-Amos cannot survive a motion for summary judgment "based on her own conjecture and theories of evidence." *Holmes v. Esper*, No. 3:17-cv-000682, 2019 LEXIS 141218 at *17-18 (D.S.C. July 23, 2019) (dismissing the plaintiff's pretext arguments and granting summary judgment to the defendant).

Much like Wannamaker-Amos, the plaintiff in *Holmes* "admitted to the court that she *assumed* the alleged actions of [Defendants] were based on discrimination." *Id.* at *17. The Court held that "[t]hese assumptions, not supported by cogent evidence, are insufficient. Plaintiff has not satisfied her burden to demonstrate pretext." *Id.* at *18 (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004), quoting *Burdine* at 256). Again, Wannamaker-Amos does not identify herself as a victim of intentional discrimination. She simply does not know whether her discharge was because of her membership in various protected classes. This Court cannot imply bias when Plaintiff herself fails to do so.

Similarly, Wannamaker-Amos cannot rely on her own assumptions to establish pretext. In *Norman v. Call-A-Nurse, LLC* 2018 U.S. Dist. LEXIS 204877 (M.D.N.C. Dec 4, 2018), summary judgment was granted to the defendant when plaintiff testified "I have to assume it was my age" when asked to provide the basis for her claim. The Court held that such an assumption is insufficient to counter a legitimate nondiscriminatory reason for discharge and to prove that a protected characteristic was, in fact, the reason for intentional discrimination. *Id.*

The law is clear: Wannamaker-Amos cannot establish pretext based on her unsupported opinions, conjecture, or assumptions. Moreover, the record evidence demonstrates that Wannamaker-Amos herself is not certain if intentional discrimination was the real reason for her termination. As a result, she cannot

"present evidence of specific facts from which the finder of fact could reasonably find for . . . her." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Wannamaker-Amos, in effect, admits that there is no evidence of pretext, meaning Purem's legitimate reason for termination stands unquestioned, and the District Court's grant of summary judgment must be affirmed.

### 4. Conclusion

For the reasons set forth above, Purem respectfully requests that this Court AFFIRM the District Court's grant of its motion for summary judgment, again dismiss Plaintiff's amended complaint with prejudice, and grant any and all further relief as it deems just and proper.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Local Rule 34(a), Purem requests that oral argument be held in this matter because the decisional process would be significantly aided by oral argument. Though the material facts are simple and undisputed, Wannamaker-Amos has made an inordinate number of arguments related to pretext evidence in an attempt to muddy the clear waters in which her case drowns. Oral argument would allow Purem to highlight for this Court its true considerations.

47

RESPECTFULLY SUBMITTED BY:

MELISSA TETREAU
REBECCA SEGUIN-SKRABUCHA
BODMAN PLC
201 W. Big Beaver, Suite 500, Troy, MI 48084
(248) 743-6000
mtetreau@bodmanlaw.com
rseguin-skrabucha@bodmanlaw.com
*Counsel for Defendant-Appellee*

48

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. __23-1568__     **Caption:** Carmen Wannamaker-Amos v. Purem Novi, Inc.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

> **Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

> **Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

> **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✔] this brief or other document contains ____10,560____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✔] this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word _____ [*identify word processing program*] in 14 and Times New Roman _____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) Rebecca Seguin-Skrabucha _____

Party Name Appellee Purem Novi, Inc. _____

Dated: 9/11/2023 _____